2023 IL App (1st) 200996

SIXTH DIVISION
June 9, 2023

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-20-0996

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 14 CR 17402 |
| BRADY FRANKLIN, | ) ) | Honorable Kenneth J. Wadas, |
| Defendant-Appellant. | ) ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices C.A. Walker and Tailor concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, Brady Franklin was convicted of aggravated criminal sexual assault and aggravated kidnaping and sentenced to a total of 22 years in prison. On appeal, Mr. Franklin argues that the trial court erred in granting the State's motion to allow the complaining witness, an adult with documented intellectual disabilities, to testify via closed-circuit television. He asserts that the portion of section 106B-5 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/106B-5 (West 2018)), permitting the court to authorize such procedures for adult accusers with intellectual disabilities, is facially unconstitutional. Allowing such accusers to testify remotely, he argues, runs afoul of the right of criminal defendants to be confronted with the witnesses against them and goes beyond the limited exception to that right for *child* victims of

sexual abuse established by the United States Supreme Court in *Maryland v. Craig*, 497 U.S. 836 (1990).

¶ 2      Mr. Franklin argues in the alternative that even if section 106B-5 might be constitutional for some adult accusers, it was unconstitutionally applied in this case for two reasons. First, he asserts that the complaining witness "was both more functional in society than most intellectually disabled adults and would not have suffered any long-term emotional trauma from testifying in [his] presence." Second, he contends that the specific procedure employed by the trial court in his case—where he, rather than the complaining witness, was the person segregated from the courtroom—was "the opposite procedure" from the one authorized by section 106B-5 and, thus, violated both the statute itself and his fundamental right to be present at all critical stages of the prosecution. We consider and reject each of these arguments and affirm Mr. Franklin's conviction.

¶ 3                                    I. BACKGROUND

¶ 4      Brady Franklin was charged by indictment with multiple counts of aggravated criminal sexual assault, aggravated kidnaping, and aggravated battery. The charges stemmed from events involving Mr. Franklin's estranged wife, S.R., who alleged that he abducted, beat, and repeatedly raped her over the span of several days in late July 2014.

¶ 5       A. The State's Pretrial Motion to Permit Testimony by Closed-Circuit Television

¶ 6      On February 20, 2018, the State moved to allow S.R. to testify by closed-circuit television, pursuant to section 106B-5 of the Code (725 ILCS 5/106B-5 (West 2016)). Section 106B-5 allows for the testimony of "a person with a moderate, severe, or profound intellectual disability," to be taken outside the courtroom and shown via closed-circuit television upon a judicial determination that requiring the witness to testify in the courtroom would result in such "serious emotional distress" that the witness would not be able to reasonably communicate or

would cause the witness to suffer "severe adverse effects." *Id.* § 106B-5(a)(2). This procedure is only available "in the prosecution of an offense of criminal sexual assault, predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual abuse, aggravated criminal sexual abuse, aggravated battery, or aggravated domestic battery." *Id.* If the defendant represents himself *pro se*, the procedure is not available. *Id.* § 106B-5(g).

¶ 7       The State explained in its motion that S.R. suffered from sickle cell anemia and had been prescribed medication in the past for anxiety, panic disorder, depression, and post-traumatic stress disorder. She had also been sexually abused repeatedly between the ages of 9 and 15 and was physically and mentally abused by her mother, who was a drug addict. S.R. herself had also "battled addiction throughout her life."

¶ 8       According to the State's motion, S.R. also had a profound intellectual disability. The State attached to its motion a cognitive evaluation of S.R. conducted by Dr. Lori Tall at Rush Neurobehavioral Center in Skokie, Illinois, on January 28, 2018. According to Dr. Tall's report, on the Weschler Adult Intelligence Scale, S.R. obtained a full-scale IQ of 57, which Dr. Tall characterized as "extremely low and consistent with individuals diagnosed with an intellectual impairment." According to the results of the Woodcock Johnson Tests of Achievement, S.R.'s reading, spelling, and basic math skills were at kindergarten level. S.R. also received an overall score of 50 (below the first percentile), which is "in the impaired range of functioning," on the Vineland Adaptive Behavior Scale. This result suggested to Dr. Tall that, overall, S.R. was "functioning at a level typically seen in someone much younger" (8 to 10 years of age) and required "a significant amount of support to function, adapt, and cope with the demands of adulthood."

¶ 9       Dr. Tall noted in her report that S.R. had not been employed and that, prior to dropping out of high school in the ninth grade, she had received special education services for "learning issues

and not being able to read." Dr. Tall wrote that S.R. had four children and eight grandchildren, all of whom lived outside of the home. S.R. did not drive and needed assistance navigating public transportation. The doctor further explained that S.R. resided with her boyfriend, who provided "a great deal of care and support for her," including preparing her meals and completing all the household chores.

¶ 10    Dr. Tall described S.R. as friendly and talkative at the outset of her session. She was "generally happy, relaxed and positive." However, when the conversation shifted to the events involving Mr. Franklin, "she became very dysregulated," was "sad and tearful," and "had a difficult time communicating her thoughts and emotions."

¶ 11    In the report's summary, Dr. Tall wrote that S.R. had "severe cognitive and adaptive difficulties" and that her cognitive profile included "impairments in cognitive functioning, academic abilities, learning and memory, processing speed, and adaptive functioning," all of which were consistent with a moderate intellectual disability. The doctor further explained that while S.R. "does not look any different from other adults her age," it was important for those interacting with her to understand that "developmentally she [was] approximately eight to 10 years old (cognitively and emotionally) and academically, she function[ed] at the level of a typical five to six year old." Dr. Tall opined that S.R. would "require a significant level of support" to participate in Mr. Franklin's trial, including "someone to assist with translating complex concepts and to ensure she fully underst[ood] questions."

¶ 12    The State asserted in its motion that Dr. Tall's cognitive report and professional medical opinion established that S.R. was moderately disabled and that she therefore came within the classes of individuals that section 106B-5 of the Code is intended to protect. "Given the diagnosis and fragile condition of [S.R.]," the State summarized, "it is the professional medical opinion of

Dr. Tall that the psychosocial stressor of a face to face confrontation with the Defendant will result in serious emotional distress such that she cannot reasonably communicate and severe emotional distress that is likely to cause her to suffer severe adverse effects."

¶ 13    On July 11, 2018, Mr. Franklin filed a motion to exclude testimony by closed-circuit television, arguing that such testimony would violate his right to confrontation as guaranteed by the sixth amendment of the United States Constitution. Mr. Franklin argued that the legislative intent behind section 106B-5 was to protect child victims and that it had "never been used in the case of an adult complaining witness." Broadening the scope of that provision to apply to adults, Mr. Franklin asserted, would impermissibly interfere with his constitutional right to face his accuser. Mr. Franklin described S.R. in his motion as "a mother of four and grandmother of eight and the sole caretaker of her household." He argued that she was a "habitual user of crack cocaine" during the past 15 years, as evidenced by several drug arrests and convictions since 2000. Mr. Franklin also highlighted a 2009 conviction for class 3 felony forgery, and he alluded to statements made by S.R.'s probation officer, who communicated that she did not think S.R. had a mental illness but that she "struggle[d] with anger issues."

¶ 14                        B. The Hearing on the State's Motion

¶ 15    On November 14, 2018, the circuit court conducted a hearing on the State's motion to allow S.R. to testify under the special procedures outlined in section 106B-5. At oral argument, the State explained that the hearing lasted "the better part of a day." The transcript from the hearing, which is in the record, runs nearly 50 pages.

¶ 16    At the hearing, the State called two witnesses: Dr. Lori Tall, the clinical psychologist who had evaluated S.R. and whose report the State had attached to its motion, and Maria Godinez, a victim specialist at the Cook County State's Attorney's Office who had met with S.R. several times

and could testify to S.R.'s "inability to communicate" when discussing the allegations against Mr. Franklin.

¶ 17    Dr. Tall testified that she was a clinical psychologist with 20 years of experience. Before starting her own private practice in February 2018, she served as the Clinical Director of the Neurobehavioral Center at Rush University Medical Center (Rush). Dr. Tall confirmed that on January 28, 2018, while still at Rush, she had met with and conducted an evaluation of S.R. She explained that she examined S.R. and produced a report at the behest of the State's Attorney's Office, who paid her a fee of $1000 to "determine her overall levels of cognitive and adaptive functioning." On cross examination, Dr. Tall stated that the evaluation of S.R. was the first and only time she met with S.R., but that their encounter lasted approximately four hours.

¶ 18    The State asked Dr. Tall to describe S.R.'s demeanor when she first met her and Dr. Tall explained that "she was very nervous about going through the evaluation and uncertain about what we would be doing." S.R. was accompanied by a social worker and an investigator, who "she felt very comfortable with." Since she "was unable to transition away from" being with these two support team members, Dr. Tall permitted them to sit in the room during the evaluation on the condition that they stayed quiet and did not attempt to answer any questions or clarify any responses for S.R. Dr. Tall explained that it was typical for her to allow the individuals she examined to have support people present with them, as "it's with a population of children and adults who are highly anxious and/or have cognitive disabilities or some type of medical issue that makes it hard for them to function independently."

¶ 19    At the beginning of her interview, Dr. Tall learned that S.R. was 47 years old and that she had dropped out of school after her freshman year of high school. S.R. told Dr. Tall that she received support throughout her educational career for "not knowing how to read, write, or perform

math problems." The State asked if S.R. was literate and Dr. Tall explained that one of the tests she administered during her examination of S.R. was the Woodcock-Johnson Test which measures educational achievement. That test revealed that while S.R. could identify all the letters of the alphabet and identify sounds, her overall reading scores were at kindergarten level.

¶ 20    The State then asked Dr. Tall about S.R.'s daily life skills. Dr. Tall explained that S.R. resides with her boyfriend who "basically takes care of her can completes chores and cooking." He also helps her get to appointments and navigate public transportation, as she does not drive and gets nervous using public transportation on her own because she cannot read all the signs. Dr. Tall further testified that S.R. has never lived independently, without the presence of another adult in the household.

¶ 21    The State then asked if they discussed the incident involving Mr. Franklin at any point during the evaluation.  Dr. Tall said yes and explained that when the topic of conversation turned to Mr. Franklin's alleged crimes, S.R. "became highly emotional, fearful. It was really hard for her to communicate her thoughts and ideas. At one point she shut down and just was crying. She wasn't able to answer my questions or describe the events at that point in time. She just asked to go home." Dr. Tall explained that it took about 30 minutes to calm S.R. down and get her to a place where she was able to complete the evaluation. S.R.'s demeanor experienced a "significant change" once Dr. Tall told her that she would not ask any more questions about the incident involving Mr. Franklin. Dr. Tall testified that once S.R. was calmed down, "[e]ven though she functions at a fairly low level, she is able to answer basic questions. She has a sense of humor. She can be engaging, so she was able to return to that level of functioning with support."

¶ 22    The State then asked a series of questions about the tests Dr. Tall administered. The first test discussed was the "Weschler Adult Intelligence Scale" (WAIS) which Dr. Tall explained is a

"standardized measure of intellectual functioning or problem-solving abilities in adults" that is typically administered beginning at the age of 16. The test consists of four different sections: verbal comprehension, perceptional reasoning, processing speed, and working memory and produces an overall IQ score. Dr. Tall testified that S.R. scored an overall "full-scale IQ" of 57 on the WAIS, which is "beneath the first percentile in the impaired range of functioning." S.R.'s score of 57 "means that she is functioning at a very low level," as anything below 70 is considered an intellectual disability. Such a low score, Dr. Tall explained, would make it "very hard" for her to gain employment or graduate high school without a significant amount of special education support. Dr. Tall further testified that "it would be challenging for her to function completely independently as a normal adult would."

¶ 23    The State then asked Dr. Tall about the Woodcock-Johnson Test, which Dr. Tall described as a measure of academic achievement that focuses on skills like reading, spelling, and math. Dr. Tall testified that the results of the Woodcock-Johnson test suggested that S.R. reads and writes at kindergarten level. She was able to write her own name, but not much else. As for her math skills, S.R. was able to add and subtract single digits, but that was all.

¶ 24    The next test discussed was the Vineland Adaptive Behavior Scale, which Dr. Tall described as a "measure of adaptive functioning." She explained that the scale measures "your ability to apply your intelligence to your life" (*i.e.* social skills, communication abilities, hygiene and chores, overall functioning in the community). S.R. obtained an overall score of 50, which "is beneath the first percentile" and in the impaired range. Dr. Tall explained that while "[S.R.] has some higher level skills in her ability to socialize and interact" overall she has very limited skills, which makes it hard for her to complete the tasks required to live independently. Overall, Dr. Tall testified, "she functions at the age range of 8 to 10 years."

¶ 25    The State asked Dr. Tall if, after administering all of the tests, she had an opinion as to whether S.R. suffered from an intellectual disability. Dr. Tall responded that she did, and that it was her opinion that S.R. met the criteria for a moderate intellectual disability under the Diagnostic Statistical Manual (DSM).

¶ 26    The State then shifted to the topic of S.R.'s emotional state, revisiting what Dr. Tall stated earlier about S.R. shutting down emotionally when the topic of Mr. Franklin came up. The State asked: "You said at one point that she shut down. Can you explain exactly what that looked like specific to [S.R.] and in comparison to maybe someone functioning without an intellectual disability?" Dr. Tall responded as follows:

> "Yes. So I think that when [S.R] became emotional, like when we all become emotional, emotions floods the brain and it impacts our ability to communicate and to problem solve and to process information. And I think what's particularly challenging for [S.R.] is given that she does not have the cognitive reserve that a normal functioning person in the population would have, it really disallows her to even communicate. I mean, she was really only able to cry like to communicate, you know, like a function that I understood she was sad and upset and this was very hard for her to talk about. She also became somewhat disorganized and really I think had a fight or flight response where she just kept saying 'I just want to go home. I just want to go home. I just want to go home.' And I think that's where she felt safest in the world. And so I think at that point that's why I backed away and we stopped, you know, kind of engaging in the conversation about the events."

The State then asked Dr. Tall directly what her opinion was as to S.R.'s ability to participate in Mr. Franklin's criminal trial and Dr. Tall stated: "I think it is very limited given the emotional response she has to—and the impact it has on her language and problem solving abilities and

comprehension skills when she gets emotional." The doctor continued, "if she was in the courtroom with other people that are present, including the man accused in this crime, I think that she would not be able to function." Without special accommodations, Dr. Tall predicted, S.R. would "end up just being highly emotional and crying and probably not even fully comprehending the questions or she would lose the ability to really express herself."

¶ 27    The State next called Maria Godinez, a victim specialist at the Cook County State's Attorney's Office. Ms. Godinez explained that her job was to serve as a liaison between the state's attorneys and the victims. She testified that she met with S.R. in person in her office 5 to 10 times while the case against Mr. Franklin was pending. Ms. Godinez further explained that she had to always make sure to schedule her meetings with S.R. on dates where nothing was happening in Mr. Franklin's case, because S.R. was "extremely fearful of running into the defendant" at the courthouse.

¶ 28    Ms. Godinez testified that during her conversations with S.R., she tried "[o]n many occasions" to discuss Mr. Franklin's alleged crimes, but that whenever the topic came up, S.R. would "breakdown and go into crisis." She described these crises as S.R. crying, shaking, and experiencing panic attacks. When this would happen, Ms. Godinez "would try to make her feel comfortable and safe" and "[l]et her know that the defendant was nowhere near" and that they would "work through it step by step." Ms. Godinez explained that once S.R. got worked up, it would take a while to calm her back down and "it would take some hugging, some physical contact in order to hold her to try to bring her back to a normal state." Ms. Godinez recalled one incident in particular where S.R. became so unsettled that she began to have breathing issues and she "kept saying she was going to pass out." Ms. Godinez thought she would have to seek medical assistance, but eventually, after holding her and giving her some water, she was able to calm S.R. down. Ms.

Godinez testified that, despite these difficulties, over the four years she had been meeting with S.R., she was eventually able to talk about the facts of the incident "to some extent."

¶ 29    The trial court then examined S.R. *in camera* to make its own assessment of her psychological, emotional, and intellectual levels. The State and Mr. Franklin's counsel were present for that examination, but Mr. Franklin was not. The judge began by explaining to S.R. that "Brady Franklin is not coming in here." He then introduced her to the people who would be present during questioning. The judge explained that he wanted to see her answer a few questions to gauge if she could handle testifying in open court. S.R. told the court that she was scared at the prospect of testifying, and the court explained that Mr. Franklin was "locked up. He's in custody. He's not going anywhere." The court asked if she had any questions, and she responded that she did not.

¶ 30    The State then asked S.R. if she would feel any safer testifying in the courtroom knowing that there would be sheriff's deputies present to secure Mr. Franklin and she said no. The State followed up by asking if S.R. would be able to talk about the case if she was in a different room from Mr. Franklin, and S.R. responded, "[y]es, ma'am. I would feel much better." She was then excused from the courtroom.

¶ 31    At the conclusion of the hearing, the State argued that it had established both "prongs" of the section 106B-5 requirements. Through Dr. Tall's testimony, it had established that S.R. suffers from an intellectual disability. Through Ms. Godinez's testimony, as well as S.R.'s "own answers and presentation," it had established that if S.R. were required to testify in open court in the presence of Mr. Franklin, she would essentially be unable to communicate what happened to her. Thus, the State asserted, in the interest of justice, S.R. should be permitted to testify in "the safest type of environment," which, based on her fragile emotional state and documented intellectual disability, "would not be in an open courtroom in the presence of the defendant."

¶ 32    Defense counsel responded that the courtroom was a safe environment and that Mr. Franklin would be secured at all times by the sheriff's deputies. Counsel also noted that S.R. was on social security disability for sickle cell anemia, not for any intellectual disability, and that while her IQ was indeed low, she was capable of basic math skills and, as Dr. Tall's report suggested, she could engage in conversation and was capable of answering questions. Counsel also stated that "all victims or alleged victims of a crime are fearful and emotional" but that this concern must be weighed against Mr. Franklin's constitutional right to confront the witnesses against him.

¶ 33    In reply, the State explained that it agreed with defense counsel's statement that all victims of crime have reasons to be fearful of the defendants alleged to have committed those crimes, but that Dr. Tall's testimony showed that S.R.'s condition "rises to a different level"; her "intellectual deficits" contribute to an inability to "overcome that discomfort and overcome that fear and still be able to testify and communicate."

¶ 34    In announcing its ruling, the court began by noting that it was tasked with balancing Mr. Franklin's confrontation rights with "the victim's right to not have an emotional breakdown in the course of a trial." The court then stated that it had been persuaded that S.R. was "affected by a developmental disability" and that she was "profoundly moderately or severely intellectually disabled," such that she should be permitted to testify outside of Mr. Franklin's presence. "[E]motionally, she's a wreck. There is no question about that," the court observed. "I don't even think it's a close call." Based on what it had seen during its own examination of S.R., the court also observed that in its view, allowing her to testify in the courtroom might actually be *prejudicial* to Mr. Franklin. Due to the high likelihood that S.R. would experience an emotional breakdown while testifying, the court wondered whether "it might be to [Mr. Franklin's] advantage that she testify from a location away from the inside of the well of the courtroom." The court then granted

the State's motion, ruling that, "[t]he victim will be allowed to testify from my chambers and via a closed circuit television consistent with the statute."

¶ 35                                    C. Trial

¶ 36                              1. The State's Case

¶ 37    At Mr. Franklin's bench trial, which began on August 29, 2019, the State called S.R. as its first witness. During S.R.'s examination, she testified in open court while Mr. Franklin was secured behind the courtroom in the deputies' area where he watched the proceedings via a television feed. Present with Mr. Franklin was one of his attorneys, who was able to communicate with his lead defense counsel, who was in the courtroom, by text message. We note that this arrangement is not what the court had authorized when it ruled on the State's motion. In that ruling, the court had said S.R. would testify via a closed-circuit television from his chambers, while Mr. Franklin would presumably remain in the courtroom. The record provided to this court does not reflect how and when the decision was made to remove Mr. Franklin from the courtroom rather than S.R., nor does it reflect who requested this change or any specific objection by Mr. Franklin to this change.

¶ 38    S.R. testified that she was 49 years old and that, at the time of the events in question, she was married to Mr. Franklin and lived with him and his daughter, Breanna. She had four children of her own, all of whom were fathered by another man who had passed away in 2009. She did not recall how long she was married to Mr. Franklin, nor could she recall with any specificity how she had met him. She explained that she stopped living with Mr. Franklin in early July 2014 because of an incident where he had kicked her in the face with his boot, and "blacked [her] eye." The incident led her to move a few blocks away, where she stayed with her aunt and uncle. The State then asked S.R. about the events of July 20, 2014.

¶ 39    S.R. testified that sometime that day, Breanna and Breanna's brother, Brandon, had come

over to S.R.'s house, to tell her that Mr. Franklin wanted to see her. After they left, she put on clothes and went to the store. It was dark outside by the time she left for the store, which she said was just a block away. She bought cigarettes and was heading back towards her aunt's house where she lived when she "felt something sticking me in my back" and heard Mr. Franklin's voice telling her not to move, just to keep walking.

¶ 40    S.R. testified at length about what happened next, describing how Mr. Franklin took her back to his house and held her captive for three days. In that time, he tied her to a chair, shaved her head, beat her with a pole, dropped a brick on her feet, and repeatedly and forcibly penetrated her—vaginally, anally, and orally—with his penis. S.R. testified that Mr. Franklin told her that she was "not going to look pretty for nobody no more," that he was digging a hole to bury her in, and that she would not see her family again. She was finally able to escape when a friend of hers, accompanied by the police, came looking for her.

¶ 41    Tanavia Williams corroborated certain aspects of S.R.'s account, although her testimony differed from S.R.'s in some key details. Ms. Williams testified that she lived in the same building where S.R. was staying and was present on July 20 when two kids, a boy and a girl, between the ages of five and fifteen, came looking for S.R., saying that something was wrong with their father. S.R. left with the two kids and, a few days later when she had not returned and no one had heard from her, Ms. Williams, accompanied by her mother and cousin, went to Mr. Franklin's house to look for S.R. Mr. Franklin told them S.R. was not there, but Ms. Williams saw S.R. waving her hand from a window. S.R. managed to run out of the house then, and Ms. Williams's mother called the police, who arrived with an ambulance shortly thereafter.

¶ 42    The State also called Breanna and Brandon Franklin, who were 11 and 9 years old, respectively, at the time of the events in question. They also corroborated part, but not all, of what

S.R. had testified to. Breanna testified that, on July 20, 2014, she remembered going with her little brother to pick up S.R. from a house a few blocks away after her father had told them to. S.R. eventually came out and walked back with the children to Mr. Franklin's house. She testified that when they first arrived, "[e]verything was all cool for like a little while. I'd say five minutes" before her father and S.R. started arguing. She recalled, "[h]e told her to go to the basement. She was like no. She didn't want to go down there. She was scared. And he pushed her down there, and they went to the basement."

¶ 43    Breanna was not sure about what happened in the basement, as she and her brother remained in the kitchen playing a computer game, but she recalled hearing the sound of a metal pipe hitting the cement floor and S.R. screaming. At this point, she and her brother looked at each other and "we both got scared." Her father then called her downstairs and told her to bring some ice, which she did. She "really didn't see nothing" when she entered the basement, but she saw S.R. sitting in a chair and she noticed a pipe on the floor. She described S.R. as "like having a scared look on her face like she was terrified or something, but she didn't say nothing to me." She gave her father the ice and went back upstairs. She testified that about 10 minutes later, he called for more ice. On her way back upstairs, he then asked for her to bring down scissors, which she brought him, and then went back to the kitchen. Sometime later, S.R. came upstairs and "she didn't have no hair." "It looked like she'd been crying, and she still had a terrified look on her face."

¶ 44    Breanna also recalled S.R. calling her into the bathroom, pulling up her pant leg, and showing her a bruise on her thigh. S.R. told her that Mr. Franklin had hit her with the pipe and had tied her up in the basement. Mr. Franklin then came into the bathroom and told Breanna to leave. Sometime later, S.R. and Mr. Franklin came out of the bathroom and went to the bedroom, where Breanna heard them "having intercourse." She then went to sleep in her room with Brandon. The

following morning, Brandon woke her up because the police were outside. "When I went outside, I seen [S.R.] run past me. And she ran out the gate, and she was like help me, help me, screaming and stuff. And I could like see the bruises clear as day now because it's light outside." She then saw her father getting handcuffed.

¶ 45     Brandon's testimony was similar to Breanna's. He also remembered walking with his sister to get S.R., who returned with them to Mr. Franklin's house. He testified that upon arriving back at his father's house, his father and S.R. were playing cards before they "got to arguing." At some point, S.R. and his father left the bedroom and went into the basement. Echoing his sister's testimony, he testified that he remembered hearing a scream emanating from the basement and the sound of a pipe hitting the floor. He also testified that at some point, after his father had come back upstairs, he brought S.R. a glass of water and "her hair was gone" and "[s]he seemed sad." When S.R. eventually came back upstairs, he recalled seeing a bruise on her leg, and that she and Breanna were talking about something in the bathroom, but he did not hear what they were saying. His father and S.R. went to the bedroom, and he went to sleep. He woke up the following morning to police at the house, "banging on the window asking for S.R."

¶ 46     In addition to these eyewitnesses, the State also called several law enforcement witnesses, including the investigator on the case and the officer who arrested Mr. Franklin, an evidence technician, and the nurse who examined S.R. in the hospital and administered a sexual assault kit. The State also entered testimony by way of stipulation from forensic technicians on issues related to the physical evidence. It was stipulated that if these witnesses were called to testify, they would testify that semen matching Mr. Franklin's genetic profile was found on the kit's vaginal swab, but not on the oral or anal swabs. Additionally, a sample of the pipe allegedly used to beat S.R. did not reveal any blood. Upon entering the stipulations, the State rested its case-in-chief.

¶ 47    Mr. Franklin then moved for a directed verdict, noting several discrepancies between S.R.'s testimony and the State's other witnesses. Among others, defense counsel noted how both Breanna and Brandon testified to picking S.R. up from her aunt's house and to her walking back to Mr. Franklin's home with them, voluntarily. This testimony conflicted with S.R.'s claims about being abducted by Mr. Franklin in front of the store. In response, the State conceded that while there were some portions of S.R.'s testimony that were inconsistent, "none were to major points or the elements of the offenses and none that can't be explained by the passage of time since this event happened." The court denied Mr. Franklin's motion for a directed verdict.

¶ 48                                    2. The Defense Case

¶ 49    Mr. Franklin testified on his own behalf. On direct examination, he testified that he had married S.R. in 2011, but that by July 2014, the two were separated and S.R. would sometimes stay at her family's house a few blocks away. Mr. Franklin recalled that on the evening of July 21, 2014, his kids wanted to get something from the store, so he gave them an electronic benefits transfer (EBT) card. He told them that if they saw S.R. while they were out to "tell her to call me." When the kids returned from the store, S.R. was with them. He testified that he and S.R. then went into the bedroom where they played cards. S.R. wanted to talk about their marriage. Mr. Franklin testified that their conversation in the bedroom "got a little bit loud."

¶ 50    Mr. Franklin further testified that when S.R. arrived at his house with the kids, he had noticed that there was an issue with S.R.'s hair: "[S]he had tracks in her head, and the back was kind of hanging down, like it had c[o]me loose and whatnot." S.R. wanted to fix her hair, so he gave her a towel. He testified that they went to the basement because the water in the building had been cut off and the basement faucet was the only one that still worked. S.R. asked if he had any shampoo, and he sent her upstairs to the medicine cabinet. Mr. Franklin testified that S.R. had

accidentally grabbed the wrong bottle from the cabinet, which is where he kept a homemade liquid he used for shaving, which included a hair removal chemical. S.R. started applying the liquid to her head and yelled out "this stuff is burning me," which is when he realized she had grabbed the wrong bottle. He testified that her hair started falling out in sections and that he never cut her hair.

¶ 51 He further testified that after the hair incident in the basement, they went back upstairs, and S.R. went into the bathroom to look at herself in the mirror. He recalled Breanna talking with S.R. in the bathroom. He then went to his bedroom and S.R. came in a few minutes later, where they proceeded to have consensual sex. He testified that he never tied her up and never forced her to have sex with him. He also denied taking S.R. back to his house against her will from the store or ever telling her that she could not leave. He testified that he did not have any type of violent or physical altercation with S.R. during the period between July 21 and July 23, when he was arrested.

¶ 52 On cross-examination, Mr. Franklin admitted that he had caused the injury to S.R.'s foot but claimed it had been an accident. He testified that when they first went down to the basement, he was lifting weights. He had constructed a homemade fitness device where weights were attached to a cable on a pulley, which he could lift by pulling in a downward motion. As he was using this device, "the whole thing collapsed" and some of the weights fell on S.R.'s foot, clipping her toe, causing her to cry out in pain. He then called for his kids to bring down some ice.

¶ 53 Defense counsel also introduced testimony by way of stipulation from Detective Jerome Malkowski of the Chicago Police Department who, if called, would testify that he had reviewed all the surveillance footage from the store that S. R. had claimed to have gone to, for the time period from July 20 and 21, 2014, and that neither S.R. nor Mr. Franklin appeared in any of the footage.

¶ 54 D. Finding of Guilt and Sentencing

¶ 55    After closing arguments, the court found Mr. Franklin guilty of aggravated kidnaping and three counts of aggravated criminal sexual assault (to account for three separate instances of sexual assault involving the vagina, mouth, and anus). Mr. Franklin filed a motion for a new trial, drawing the court's attention to the lack of physical evidence regarding two of those counts. The court revisited its earlier ruling and granted Mr. Franklin's motion as to those charges. The court then sentenced Mr. Franklin to consecutive sentences of 16 years for one count of aggravated criminal sexual assault and 6 years for aggravated kidnapping, the statutory minimum for each offense. This appeal followed.

¶ 56                                II. JURISDICTION

¶ 57    Mr. Franklin timely filed his notice of appeal on October 6, 2020, the same day he was sentenced. We have jurisdiction over this appeal under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb 6, 2013) and 606 (eff. July 1, 2017), governing appeals from final judgments in criminal cases.

¶ 58                                III. ANALYSIS

¶ 59    On appeal, Mr. Franklin argues that section 106B-5 of the Code is unconstitutional because, in permitting adult accusers to testify outside the accused's presence, it goes beyond the limited exception to confrontation rights carved out by the United States Supreme Court in *Craig*, 497 U.S. 836. Mr. Franklin also makes two additional arguments as to the application of the statute in his case. First, he asserts that even if section 106B-5 survives a facial challenge, it was unconstitutionally applied in this case because S.R. was "more functional in society than most intellectually disabled adults and would not have suffered any long-term emotional trauma from testifying in [Mr. Franklin's] presence." Next, he contends that the specific procedure utilized by the circuit court in this case—where he, rather than S.R., was the person segregated from the

- 19 -

courtroom during S.R.'s testimony—was not the procedure authorized by section 106B-5 and violated his right to be present at all critical stages of the prosecution. We address these three arguments in turn.

¶ 60                    A. The Facial Constitutionality of Section 106B-5

¶ 61    Illinois statutes carry a strong presumption of constitutionality. *People v. Mosley*, 2015 IL 115872, ¶ 22. To overcome this presumption, the party challenging the statute must clearly establish its invalidity. *Id.* As our supreme court explained in *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 305-06 (2008), a facial challenge to the constitutionality of a legislative enactment is "the most difficult challenge to mount successfully" because "an enactment is facially invalid only if no set of circumstances exists under which it would be valid." Moreover, in reviewing such challenges, "[w]e have a duty to construe the statute in a manner that upholds the statute's validity and constitutionality, if it can be reasonably done." *People v. Hollins*, 2012 IL 112754, ¶ 13. As the constitutionality of a statute is a question of law, our review is *de novo. People v. Sharpe*, 216 Ill. 2d 481, 486-87 (2005).

¶ 62    The confrontation clause of the sixth amendment, made applicable to the states through the fourteenth amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. The Illinois Constitution also has a confrontation clause, which, in 1994, was amended to mirror the language of the United States Constitution. Ill. Const. 1970, art. I, § 8 (amended 1994); *People v. Lofton*, 194 Ill. 2d 40, 53 (2000).

¶ 63    Mr. Franklin argues that the portion of section 106B-5 of the Code that permits adult victims of sexual abuse who have intellectual disabilities to testify by closed-circuit television violates the confrontation clause for two reasons: (1) it improperly expands *Maryland v. Craig*'s

limited exception to the right to face-to-face confrontation for *child* accusers and (2) it violates the holding from *Crawford v. Washington*, 541 U.S. 36 (2004), where, 14 years after *Craig*, the United States Supreme Court provided a more robust framework for protecting the right to confront one's accuser. We are not persuaded by either of these arguments.

¶ 64                                   1. *Maryland v. Craig*

¶ 65    In *Craig*, 497 U.S. at 840, the United States Supreme Court was tasked with determining whether the confrontation clause "categorically prohibit[ed] a child witness in a child abuse case from testifying against a defendant at trial, outside the defendant's physical presence, by one-way closed circuit television." At issue was a Maryland statute similar to the Illinois statute at issue in this case as it applies to child witnesses. The Maryland statute allowed child victims of sexual abuse to testify via closed-circuit television if the trial judge determined that requiring them to testify in the courtroom would result in their suffering such serious emotional distress that they could not reasonably communicate. *Id.* at 841. The defendant argued the statute unconstitutionally stripped her of the right to stand face-to-face with her accuser.

¶ 66    The Court rejected the defendant's constitutional challenge and upheld the statute. It held that:

> "where necessary to protect a child witness from trauma that would be caused by testifying
> in the physical presence of the defendant, at least where such trauma would impair the
> child's ability to communicate, the Confrontation Clause does not prohibit use of a
> procedure that, despite the absence of face-to-face confrontation, ensures the reliability of
> the evidence by subjecting it to rigorous adversarial testing and thereby preserves the
> essence of effective confrontation." *Id.* at 857.

¶ 67    The Court's analysis in *Craig* began with the observation that "[t]he central concern of the

Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Id.* at 846. The Court then reviewed a long line of cases and concluded that while its precedents clearly established a preference for face-to-face confrontation, that preference " 'must occasionally give way to considerations of public policy and the necessities of the case.' " *Id.* at 849 (quoting *Mattox v. United States*, 156 U.S. 237, 243 (1895)). Accordingly, the Court explained, the Confrontation Clause "may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Craig*, 497 U.S. at 850. The Court concluded that procedures authorized under the Maryland statute satisfied these conditions.

¶ 68 In the Court's view, not only did the statute advance the important public policy interest of protecting vulnerable child witnesses, but it also potentially *enhanced* the reliability of testimony, rather than merely assured it. The Court noted that "where face-to-face confrontation causes significant emotional distress in a child witness, there is evidence that such confrontation could *disserve* the Confrontation Clause's truth-seeking goal." (Emphasis in original.) *Id.* at 857. Throughout its opinion, the Court stressed that the Maryland statute before it ensured "rigorous adversarial testing" that preserved "the essence of effective confrontation." *Id.*

¶ 69 Mr. Franklin argues that the holding in *Craig* was a limited one that applies only to child accusers in sexual abuse cases. He asserts that *Craig* was explicitly based upon the State's unique interest in the "physical and psychological well-being of child abuse victims." *Id.* at 853.

¶ 70 *Craig* is focused on child victims of sexual abuse because that was the specific class of victims covered by the challenged statute in that case. The Court certainly discussed in some detail the unique vulnerabilities of child witnesses, but at no point did it hold that children were the only

group that could justifiably require accommodations similar to those authorized under the Maryland law. While the precise holding in *Craig* is not controlling here, as this case does not concern a child witness, the reasoning the Court employed in *Craig* does control, and in our view, that reasoning defeats Mr. Franklin's argument that the use of 106B-5 for adult witnesses with intellectual disabilities violates the confrontation clause.

¶ 71    When first passed into law in 1994, section 106B-5 applied only to child witnesses, like the statute at issue in *Craig.* As we explained in *People v. Van Brocklin*, 293 Ill. App. 3d 156, 169 (1997), by providing for the administration of an oath, cross-examination, and the defendant's observation of the witness's demeanor, section 106B-5 includes the requisite safeguards to assure reliability, preserve the essence of confrontation, and maintain the adversarial nature of the proceeding. In 2002, the General Assembly amended the statute to also apply to adult witnesses with moderate to severe intellectual and developmental disabilities. Pub. Act 92-434, § 10 (eff. Jan. 1, 2002). The statute's requirements are the same for child witnesses and adult witnesses with disabilities.

¶ 72    As with the statute at issue in *Craig*, the statute before us ensures reliability because the essence of effective confrontation remains. The witness testifies under oath and is subject to full cross examination. Effective confrontation is further assured by the fact that the State may not use section 106B-5 in cases where defendants represent themselves *pro se*. 725 ILCS 5/106B-5(g) (West 2018). Moreover, the statute can only be used in the prosecution of seven specifically listed crimes and it is only available where the judge determines that failure to use these procedures would cause the witness such "serious emotional distress" that the witness would not be able to "reasonably communicate" or would be likely to cause "severe adverse effects." *Id.* § 106B-5. As in *Craig,* because the statute can be used only where a court makes a case-specific finding that

face-to-face confrontation would cause such "serious emotional distress" that the witness would not be able to "reasonably communicate," the alternative confrontation procedures in 106B-5 may actually aid, rather than undermine, the truth-seeking goal of the confrontation clause.

¶ 73    At oral argument, counsel for Mr. Franklin argued that the expansion of the confrontation clause limitation in *Craig* to adult witnesses could extend what is meant to be a limited exception to all cases. As the defense correctly notes, few witnesses want to testify if given the choice, and the process is likely traumatic for many of them. But in our view, Mr. Franklin's fear is not well-founded, as section 106B-5 contains built-in mechanisms that limit its utilization and prevent routine use. As explained above, the statute is only available in cases where the defendant is charged with one or more of seven specifically listed offenses. Additionally, the prosecution's ability to use the procedures authorized by section 106B-5 is layered with procedural and substantive hurdles. Before any testimony can be taken outside the presence of the accused, there must be a case-specific finding of necessity by the trial court. Here, that finding was made only after briefing, a lengthy and contentious hearing that included expert witness testimony, and the court's own independent observation of the witness.

¶ 74    Beyond these statutory constraints, there is also the reality that this law has been around for over two decades, and, while the parties could not provide specific figures as to how often the statute is used for adult witnesses in criminal trials in Illinois, it appears that such use is rare. Indeed, neither party could point to any case in which this court or our supreme court has considered an appeal on the statute's application where the victim is an adult. In our view, the fact that the State has rarely relied on this statute to allow adult accusers to testify outside the accused's presence provides some reassurance that our decision here today will not, as Mr. Franklin predicts, lead to the wholesale loss of confrontation rights in Illinois.

¶ 75    We also note that the Illinois General Assembly is not the only state legislature that has made the decision to expand its law that allows for special procedures where a child victim of sex abuse testifies to adults with significant intellectual and developmental disabilities. As the State highlights in its brief, Michigan, Colorado, Louisiana, and Florida all have similar laws allowing for special arrangements to be made to accommodate adult witnesses with such disabilities. See Mich. Comp. Laws Ann. § 600.2163a (West 2019); Colo. Rev. Stat. Ann. § 16-10-402 (West 2014); La. Stat. Ann. § 15:283 (2007); Fla. Stat. Ann. § 92.54 (West 2016). Thus, while Mr. Franklin may be correct when he states that the United States Supreme Court has never specifically enumerated a "State interest in the psychological well-being of adult accusers of sexual abuse" justifying a similar exception to the confrontation right as the one it elaborated in *Craig*, several states have independently moved in that direction.

¶ 76    In sum, we are not persuaded by Mr. Franklin's argument that section 106B-5 falls outside the limitation on confrontation clause rights that the United States Supreme Court recognized in *Craig*. To the contrary, we find that under the reasoning the court employed there, Mr. Franklin's facial attack on the constitutionality of this statute must fail.

¶ 77                              2. *Crawford v. Washington*

¶ 78    Mr. Franklin next argues that the holding and analysis of the Court in *Craig* was limited by its later decision in *Crawford*, 541 U.S. 36. The United States Supreme Court was asked in that case to determine the extent to which the confrontation clause is implicated when the State seeks to admit into evidence testimonial statements uttered outside of the courtroom by unavailable witnesses. The specific evidence at issue in that case was an out-of-court tape-recorded statement made by the defendant's wife describing the stabbing for which the defendant had been charged. *Id.* at 40. The Court held that the Constitution bars the use of such statements at trial unless the

State can establish both that the declarant is unavailable to testify and that the defendant had a prior opportunity to cross-examine the declarant. *Id.* at 68. If these two preconditions are not satisfied, the statements are inadmissible, even if they bear "adequate indicia of reliability." *Id.* at 42.

¶ 79    Mr. Franklin argues that *Crawford* "overruled the sort of general balancing test applied in *Craig* in favor of a more historical approach that provides greater protections to the accused." In light of the strict, procedural framework adopted in *Crawford*, he asserts, even assuming *arguendo* that "the mental health of adults with moderate intellectual disabilities is an important state interest for the purposes of *Craig*'s balancing test, that balancing test is no longer valid following *Crawford*, and case law following and relying upon *Craig* needs to be reevaluated."

¶ 80    We acknowledge that there is tension between the approaches the Court employed in *Craig* and in *Crawford*. Justice Scalia dissented vigorously in *Craig* and brought into his majority decision for the Court in *Crawford* some of his thinking about the historical purpose of the confrontation clause that his Supreme Court colleagues had refused to embrace in *Craig*. See *United States v. Cox*, 871 F.3d 479, 492-95 (6th Cir. 2017) (Sutton, J., concurring) (cataloguing the several contradictions between *Craig* and *Crawford* and suggesting that "the two opinions would give Janus a run for his money").

¶ 81    However, these two cases are about different aspects of an accused's right to confront witnesses. *Craig* was about witnesses who testify in court, under oath and subject to cross examination, under procedures in which a defendant's right to personal face-to-face confrontation of the witness is limited. *Crawford* is about an out-of-court statement that was tape recorded but was never subject to cross examination and for which the witness was never under oath. Further, *Crawford* did not expressly overturn *Craig*. To the contrary, *Craig* is not even mentioned in the

majority opinion in *Crawford*, a conspicuous omission considering that, as noted above, Justice Scalia's thinking on the confrontation clause loomed large over both cases.

¶ 82    The Illinois supreme court continues to apply and favorably cite *Craig* in the post-*Crawford* era, despite the tensions described above. See, *e.g.*, *People v. Cuadrado*, 214 Ill. 2d 79, 89-90 (2005). As we noted in *People v. Pope*, 2020 IL App (4th) 180773, ¶¶ 44, 46, while continuing to rely on *Craig* in the era of *Crawford* "may be problematic," *Craig* nonetheless remains good law in this jurisdiction and "we are bound to follow it." We therefore reject Mr. Franklin's argument that *Crawford* effectively overruled the approach elaborated in *Craig*.

¶ 83                              B. Mr. Franklin's As-Applied Challenges

¶ 84    Mr. Franklin also challenges section 106B-5 as applied in his case. As opposed to a facial challenge of a statute's constitutional validity, which requires showing that a statute is unconstitutional under any set of facts, an "as-applied" constitutional challenge requires a defendant to show that the statute violates the constitution as it has been applied to him, a determination that is "dependent on the particular circumstances and facts of the individual defendant." *People v. Thompson*, 2015 IL 118151, ¶ 37.

¶ 85    Mr. Franklin makes two as-applied challenges. First, he argues that section 106B-5 should not have applied here because S.R. "was both more functional in society than most intellectually disabled adults and would not have suffered any long-term emotional trauma from testifying in [Mr. Franklin's] presence." Second, he argues the procedure elaborated in section 106B-5 was not strictly adhered to in his trial, as he, rather than S.R., was placed outside of the courtroom during her examination. This deviation, he argues, violated the statute and his fundamental right to be present at all critical stages of his prosecution. We consider both arguments.

¶ 86                              1. S.R.'s Capacities

¶ 87    Mr. Franklin asserts that S.R. was essentially too functional to qualify for out-of-court testimony under section 106B-5 and that the trial court erred in finding otherwise. According to Mr. Franklin, S.R. has "strong socialization skills that compensated for her cognitive deficits," and these skills helped her both "raise four children and eight grandchildren" and "commit a forgery, a felony based upon duplicitous conduct, reading, and writing." These attributes, he claims, show that S.R. was "more functional in society than most intellectually disabled adults" and therefore did not require the protections of section 106B-5. Mr. Franklin also asserts that trial court's ruling was "brief, with minimal fact finding to align the case with *Craig*'s requirements."

¶ 88    We reject these arguments. The record is clear that the court's decision in this case to allow S.R. to testify remotely was not made lightly or based on minimal fact-finding. To the contrary, the court entered its oral ruling after briefing by the parties and a lengthy hearing lasting "the better part of a day" which involved multiple witnesses and an *in camera* examination of S.R. where the court could directly observe her emotional state. Pursuant to section 106B-5, the court can order that the testimony of "a person with a moderate, severe, or profound intellectual disability" be taken outside the courtroom and shown via closed-circuit television if it determines that testifying in the courtroom would result in that witness experiencing such "serious emotional distress" that they would not be able "reasonably communicate." 725 ILCS 5/106B-5(a)(2) (West 2018). Here, there was ample evidence before the court supporting a finding that S.R. suffered from an intellectual disability and that, if forced to testify in the same room as Mr. Franklin, she would not be able to reasonably communicate. The court was fully aware of all the facts Mr. Franklin highlights about S.R.'s past, family life, and cognitive abilities; and made a finding that was supported by the record that she needed the protection afforded by section 106B-5.

¶ 89    The first witness to testify at the hearing on the State's motion to allow S.R. to testify

remotely was Dr. Lori Tall, a clinical psychologist, who opined both that S.R. suffered from a moderate intellectual disability and that if required to testify in the presence of Mr. Franklin, "she would not be able to function." Dr. Tall's opinions were based on a clinical interview she conducted with S.R. that lasted around four hours. During that interview, Dr. Tall witnessed directly how S.R. shut down emotionally when the topic of Mr. Franklin came up. At the mere mention of Mr. Franklin, S.R. started crying uncontrollably and "she wasn't able to answer my questions or describe the events at that point in time. She just asked to go home." It took Dr. Tall half an hour to calm S.R. back down to a level where she was capable of continuing the interview. Dr. Tall then administered a battery of psychological tests, the results of which led her to conclude that S.R. met the DSM criteria for an intellectual disability.

¶ 90    On the WAIS, S.R. scored a "full-scale IQ of 57," which meant, according to Dr. Tall, that "she is functioning at a very low level" (anything below 70 is considered an intellectual disability). Such a low score, she explained, would make it extremely difficult for S.R. to live an independent life. On the Woodcock-Johnson Test, which measures academic achievement, S.R. tested at kindergarten level. While she recognized the letters of the alphabet, she could not read or write much beyond her own name. As for her math skills, she could not do anything more complex than adding and subtracting single digits. Finally, on the Vineland Adaptive Behavior Scale, a test which measures basic life skills, S.R. obtained an overall score of 50, which Dr. Tall explained was beneath the first percentile and meant that "she functions at the age range of 8 to 10 years."

¶ 91    The State's second witness, Maria Godinez, was a victim's advocate who met with S.R. between 5 and 10 times while Mr. Franklin's trial was pending. While Ms. Godinez was not qualified to opine on S.R.'s intellectual capacities, she did have several firsthand experiences interacting with S.R. where she witnessed how S.R. would shut down emotionally and lose the

ability to communicate when asked about the incident involving Mr. Franklin. She explained that S.R was "extremely fearful" of Mr. Franklin and that whenever the topic of Mr. Franklin came up, S.R. would break down and "go into crisis" characterized by panic attacks, crying and shaking uncontrollably. On one occasion, Ms. Godinez recalled, the panic attack was so intense that S.R. had trouble catching her breath and Ms. Godinez thought she might have to call for medical assistance. Whenever S.R. worked herself into such a state, Ms. Godinez would have to hold her and hug her to calm her back down. Like Dr. Tall's testimony, Ms. Godinez's testimony supported an inference that if forced to testify in the same room as Mr. Franklin, S.R. would not be able to reasonably communicate.

¶ 92    In addition to hearing from Dr. Tall and Ms. Godinez, the trial court also examined S.R. *in camera* to make its own assessment of her emotional state. During the court's examination of S.R., S.R. stated that she would not feel safe in the courtroom with Mr. Franklin even if he was secured by sheriff's deputies. She also stated that she would "feel much better" if she were able to talk about what she experienced from a different room.

¶ 93    In sum, we reject Mr. Franklin's as-applied argument that the court's ruling in this case was based on minimal fact-finding. To the contrary, there was ample evidence before the court which supported its ruling. We also reject Mr. Franklin's contention that S.R.'s status as a mother supports an inference that she had "significant socialization skills" that made the use of section 106B-5 unnecessary. As the State noted in its brief and at oral argument, the fact that S.R. has several children and grandchildren bears no relationship to her cognitive abilities or her capacity to participate in Mr. Franklin's trial without suffering destabilizing emotional distress. Such an inference is even less justified where, as here, there was significant evidence suggesting that S.R. was incapable of taking care of herself, let alone her children. All of the tests administered by Dr.

Tall suggested that S.R. had the cognitive abilities of a young child and that she required "a significant amount of support to function, adapt, and cope with the demands of adulthood." Dr. Tall's report also noted that none of S.R.'s children lived with her, that she lacked the basic literacy skills required to navigate public transportation on her own, and that her partner prepared her meals and completed all the household chores.

¶ 94                    2. Mr. Franklin's Location Outside the Courtroom

¶ 95    Finally, Mr. Franklin argues that the procedure elaborated in section 106B-5 was not strictly adhered to at his trial, as he, rather than S.R., was placed outside of the courtroom during her examination, even though section 106B-5 specifically requires that "the testimony of [the] *victim* *** be taken outside the courtroom and shown in the courtroom by means of a closed circuit television (emphasis added) (*id.* § 106B-5(a)). The court, he contends, did the opposite of what the statute requires, "banishing [Mr. Franklin] from the courtroom during a critical stage of his trial while allowing S.R. to testify from inside the courtroom." This procedure, he argues, violated not only section 106B-5, but also his fundamental right to be present at all critical stages of the prosecution.

¶ 96    Both the federal and state constitutions afford criminal defendants the right to be present at all "critical stages" of proceedings, "from arraignment to sentencing." *People v. Lucas*, 2019 IL App (1st) 160501, ¶ 12; U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. This right, however, is not absolute. *Lucas*, 2019 IL App (1st) 160501, ¶ 12. "[A] criminal defendant's right of presence is violated only when his absence results in the denial of a fair and just trial." *Lofton*, 194 Ill. 2d at 67.

¶ 97    Before addressing the merits of Mr. Franklin's last argument, we note that he did not properly preserve it for review. To do so, he would have had to object contemporaneously to being

segregated from the courtroom during S.R.'s testimony and include that alleged error in a written posttrial motion. *People v. Thompson*, 238 Ill. 2d 598, 611 (2010). Here, as noted above, the record does not explain how or why the court procedure changed from having S.R. testify from chambers via closed-circuit television to having her testify in court with Mr. Franklin outside the courtroom with one of his lawyers. While there are instances in the record of Mr. Franklin objecting generally to the use of section 106B-5, there is nothing in the record before us that suggests Mr. Franklin objected to this specific alteration. At oral argument, counsel for Mr. Franklin asserted that he did in fact object contemporaneously to the altered procedure, but we have reviewed the page of the trial transcript he cited and disagree with that interpretation.

¶ 98     At the commencement of Mr. Franklin's bench trial, defense counsel stated the following:

"Judge, I ordered the transcript; I read it; I am aware of your Honor's ruling. I would just like to renew my objection for the record that it violates my client's confrontation laws. Additionally, it is my understanding, based on representation made by the State, that [S.R.] will be sitting in here in the courtroom while my client will be in the back watching via the television. And I will be objecting to anybody being allowed to sit in here while she is testifying by way of her, quote, unquote, support group; that this is a unique situation. I understand that most often trials are public. However, my client is being forced to observe [S.R.] testify in another room; and for her not to have to face my client, and also have the additional support of her people, Judge, I would feel like that is completely prejudicial to my client and ask it not be allowed."

While defense counsel certainly renewed her general objection to the use of section 106B-5, while also mounting a more specific objection to the presence of some of S.R.'s "support people" being present in the court room during her examination, she did not object specifically to the alteration

of procedure whereby Mr. Franklin would be outside of the courtroom.

¶ 99    We have also reviewed Mr. Franklin's motion for a new trial and the transcript of the hearing on that motion. While Mr. Franklin clearly preserved his general objection to the use of section 106B-5 procedures, there is no indication that he objected to the specific variation used at his trial. In fact, he stated in his posttrial motion that "the court erred when it allowed the complaining witness to testify via closed circuit television, denying the defendant his rights under Article I of the Constitution of the State of Illinois and under the Sixth Amendment of the U.S. Constitution." Thus, his motion does not even acknowledge that, in fact, it was the witness who testified in open court and that he watched her from outside the courtroom.

¶ 100   We also note that at the pretrial hearing to decide whether to allow S.R. to testify via closed-circuit television, defense counsel for Mr. Franklin expressed specific concern with the fact-finder's ability to see S.R. As the State highlights in its brief, counsel stated:

> "Your Honor, we are still objecting to her testifying outside the courtroom whether this is a bench or jury trial, the finder of fact, the trier should actually see her demeanor. See how she reacts. And they should make a determination of whether or not this is real or not. Whether or not she's faking it or this is an actual condition that she does have."

Arguably, Mr. Franklin not only forfeited any objection to this change but invited it, since the procedure the court ultimately employed at trial addressed one of Mr. Franklin's specific concerns about using section 106B-5.

¶ 101   Even if Mr. Franklin did not invite this change, we find the absence of any record of an objection in this case particularly problematic. If, as he now claims, he believed that S.R., rather than he, should have been outside the courtroom, this would have been a relatively easy adjustment for the trial court to make. Moreover, the absence of any record on this means that we have no

knowledge of what caused the trial court to veer from its originally announced procedure or of the exact procedures employed to allow Mr. Franklin to observe and communicate with his lawyer during S.R.'s testimony. In short, there is no doubt that Mr. Franklin forfeited any objection to the court's variation on the section 106B-5 procedure.

¶ 102   In his reply brief, Mr. Franklin argues that, regardless of any forfeiture, we should address this argument as a plain error. As our supreme court explained in *People v. McLaurin*, 235 Ill. 2d 478, 489 (2009), the plain-error doctrine allows us to remedy a " 'clear or obvious error,' " regardless of the defendant's forfeiture, in two situations: "(1) where the evidence in the case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence; or (2) where the error is so serious that the defendant was denied a substantial right, and thus a fair trial." Mr. Franklin's argument is that this falls under this latter "second prong" plain error.

¶ 103   The State argues that Mr. Franklin does not qualify for plain-error review on this issue because he failed to argue it in his opening brief, and "[a] defendant who fails to argue for plain-error review obviously cannot meet his burden of persuasion that plain error occurred." See *People v. Hillier*, 237 Ill. 2d 539, 545 (2010); *People v. Cooper*, 2013 IL App (1st) 113030, ¶ 91; *People v. Nieves*, 192 Ill. 2d 487, 502-03 (2000). Generally, points not argued in the opening brief are forfeited and cannot be raised for the first time in the reply brief. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). However, our supreme court has recognized that because a defendant never knows if the State will forfeit any forfeiture argument by not raising it in its response brief, "it would be unfair to require a defendant to assert plain error in his or her opening brief." *People v. Williams*, 193 Ill. 2d 306, 348 (2000); see *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010). We therefore address Mr. Franklin's argument, raised for the first time in his reply, that his temporary exclusion from the

courtroom was second-prong plain error.

¶ 104   In support of his argument, Mr. Franklin relies primarily on *Lucas*, 2019 IL App (1st) 160501, ¶ 21, where this court held that the violation of a defendant's right to be present "had a cascading impact on fundamental rights" that "amounted to second-prong plain error." But *Lucas* had nothing to do with section 106B-5 and the portions of that decision quoted by Mr. Franklin must be placed in context.

¶ 105   In *Lucas*, a trial judge in a bench trial viewed a video of a defendant's traffic stop in chambers, completely outside of the defendant's presence, and the defendant had no ability to follow what was happening as the judge watched the video. *Id.* ¶ 5. The video was a crucial piece of evidence in the case. *Id.* ¶ 4. The judge found the defendant guilty on several charges, explicitly stating in his ruling that he relied on things he had observed in the video. *Id.* ¶ 7. We reversed, finding that the defendant's absence from the judge's chambers during the screening of the video violated her right to be present in a way that affected the trial's fairness "because she was unable to view the evidence against her and aid in her own defense." *Id.* ¶ 14.

¶ 106   Unlike the defendant in *Lucas*, Mr. Franklin *was* able to view all the evidence against him and aid in his own defense, even if he had to view the testimony of one witness from another room. Mr. Franklin knew exactly what was happening in the courtroom during S.R.'s examination. He was able to closely follow via video feed and he had the capacity to object. This was quite different than *Lucas*, where the defendant was completely unaware of what was transpiring in the judge's chambers as a crucial piece of evidence was being reviewed.

¶ 107   Mr. Franklin's case more closely resembles *People v. Martinez*, 2021 IL App (1st) 172097, where we considered our decision in *Lucas* and found that it was inapplicable. In *Martinez*, the court allowed a child victim in a sexual abuse case to testify by closed-circuit television after a

pre-trial hearing, pursuant to section 106B-5. *Id.* ¶ 4. When the trial date arrived, it was the defendant, rather than the child witness, who was temporarily relocated to a nearby room to view testimony via closed-circuit television. On appeal, the defendant made the same argument that Mr. Franklin makes here, asserting that the procedure by which the court permitted the child victim to testify violated section 106B-5 and resulted in the denial of his right to be present at every critical stage of his trial. *Id.* ¶ 39. While we agreed with the defendant that "the specific procedure outlined in section 106B-5 was not followed" in his case, we rejected his plain-error argument, concluding that he was "unable to show that his absence from the courtroom resulted in an unfair proceeding or caused him to be denied an underlying substantial constitutional right." *Id.* ¶¶ 43, 45. Specifically, "there [was] no dispute that [the witness] testified under oath under the watchful eyes of the parties and the fact-finder and was subject to contemporaneous cross-examination" and the record contained "no evidence that defendant's absence *** significantly impaired his right to communicate with counsel and assist in his own defense or violated his constitutional confrontation rights." *Id.* ¶ 46. The same is true in this case.

¶ 108    The specific impairment of his rights that Mr. Franklin cites in his reply brief is that the procedure used affected his right to observe the jury and contribute to his defense. As for his right to observe the jury, this was a bench trial. Because Mr. Franklin neither objected nor provided us with a full record as to what occurred, it is unclear to this court whether Mr. Franklin could actually see the trial judge from where he was seated behind the courtroom. Even if he could not, however, Mr. Franklin cites no authority and provides no rationale as to why the temporary inability to see the factfinder in the context of testimony given pursuant to section 106B-5 amounts to second-prong plain error. As for contributing to his defense, as noted above, Mr. Franklin had full communication with his lawyer during the testimony because one of his lawyers sat with him and

- 36 -

they could text the lawyer in the courtroom.

¶ 109   In sum, as in *Martinez*, while Mr. Franklin is correct that section 106B-5 was not strictly adhered to in his case, he has not adequately shown how his temporary absence from the courtroom resulted in an unfair proceeding or rose to the level of second prong plain error.

¶ 110                                    IV. CONCLUSION

¶ 111   For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 112   Affirmed.

*People v. Franklin*, **2023 IL App (1st) 200996**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-17402; the Hon. Kenneth J. Wadas, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, Michael Gentithes, and Daniel H. Regenscheit, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Mary L. Boland, and Sarah L. Simpson, Assistant State's Attorneys, of counsel), for the People. |