## PEOPLE v BURTON

Docket No. 165983. Submitted January 10, 1996, at Grand Rapids. Decided October 8, 1996, at 9:05 A.M. Leave to appeal sought.

Michael J. Burton was convicted by a jury in the Kalamazoo Circuit Court, William G. Schma, J., of one count of assault with intent to commit murder, two counts of first-degree criminal sexual conduct, and one count of breaking and entering an occupied dwelling with intent to commit a felony. He was sentenced to concurrent terms of forty-two to one hundred years for the assault conviction, seventy to one hundred years for each criminal sexual conduct conviction, and ten to fifteen years for the breaking and entering conviction. The defendant appealed.

The Court of Appeals *held*:

1. The defendant's Sixth Amendment right to confrontation was not violated when the trial court allowed the victim to testify by way of a closed-circuit television out of the physical presence of both the defendant and the jury. The trial court erred in relying on MCL 600.2163a; MSA 27A.2163(1), which allows the special arrangements made in this case for witnesses who have a developmental disability, because the victim does not fit within the statute's definition of developmental disability. However, in a case like this, where the victim is mentally and physically challenged and the nature of the assault is extreme, the physical and psychological well-being of the victim may be sufficiently important to limit the defendant's right to face his accuser in person and in the same courtroom. The proper administration of justice supports the procedure used in this case.

2. The trial court made the appropriate findings in deciding to allow the procedure. The record supports the findings that the use of the one-way closed-circuit television was necessary to protect the welfare of the victim, that the victim would be traumatized, not by the courtroom generally, but by the presence of the defendant, and that the emotional distress suffered by the victim would be more than de minimis. On the basis of the extreme circumstances of this case, the trial court did not err in allowing the victim to testify by way of the closed-circuit television.

3. The defendant failed to raise and preserve for appellate review his allegation that the jury array from which his jury was chosen failed to contain a representative cross section of the community.

4. The trial court did not err in allowing Barbara Barton to testify as an expert witness. The Court of Appeals will not review the defendant's allegation that Barton's testimony was irrelevant and overly prejudicial, because the defendant did not object to her testimony in the trial court and manifest injustice will not result from a refusal to review the claim.

5. The defendant failed to demonstrate that his trial counsel's performance was deficient.

Affirmed.

1. TRIAL — WITNESSES — DEVELOPMENTAL DISABILITIES — WORDS AND PHRASES — "MENTAL RETARDATION."

"Mental retardation" for purposes of the statute that allows special arrangements to be made with regard to the testimony of witnesses who have a developmental disability is the lack of powers associated with normal intellectual development, resulting in an inability of the individual to function adequately in everyday life (MCL 600.2163a[1]; MSA 27A.2163[1][1]).

2. CONSTITUTIONAL LAW — RIGHT TO CONFRONTATION.

The rights guaranteed by the Confrontation Clause are not absolute and must be interpreted in the context of the necessities of trial and the adversary process (US Const, Am VI; Const 1963, art 1, § 20).

3. CONSTITUTIONAL LAW — RIGHT TO CONFRONTATION — CLOSED-CIRCUIT TELEVISION.

A trial court in determining whether to grant a prosecution motion to allow a defendant's victim to testify through the use of one-way closed-circuit television must hear the evidence and determine whether the use of the procedure is necessary to protect the welfare of the witness; the procedure, where not authorized by statute, should be allowed only in extreme cases; before granting the motion, the court must establish that the use of the procedure is necessary to further an important state interest and determine that the victim would be traumatized, not by the courtroom generally, but by the presence of the defendant and that the emotional distress suffered by the victim would be more than de minimus (US Const, Am VI; Const 1963, art 1, § 20).

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *James J. Gregart*, Prosecut-

ing Attorney, and *Michael H. Dzialowski*, Assistant Prosecuting Attorney, for the people.

*Martin J. Beres*, for the defendant on appeal.

Before: NEFF, P.J., and SAAD and MARKEY, JJ.

PER CURIAM. Defendant was convicted by a jury of one count of assault with intent to commit murder, MCL 750.83; MSA 28.278, two counts of first-degree criminal sexual conduct, MCL 750.520b(1)(f); MSA 28.788(2)(1)(f), and one count of breaking and entering with intent to commit a felony in an occupied dwelling, MCL 750.110; MSA 28.305. Defendant was sentenced to concurrent terms of forty-two to one hundred years for the assault conviction, seventy to one hundred years for each of the criminal sexual conduct convictions, and ten to fifteen years for the breaking and entering conviction. Defendant appeals as of right and we affirm.

I

The facts of this case are particularly horrific. Defendant's girl friend, Pearlie Jean Acer, rented an upstairs apartment from the victim. As a result, the victim was well acquainted with defendant before the events in question transpired. Because Acer failed to make timely rent payments, the victim evicted her. In one of the last meetings between Acer and the victim, Acer threatened the victim, indicating that a sexual assault would follow, and that if the victim were sexually attractive to the attacker, "he would remove [her] eye and not kill [her]." After this threat, defendant approached the victim twice looking for Acer, and threatened her. The second time defendant went so

far as to break into the victim's house and physically grab her.

A

On the night in question, a few weeks after Acer's threat, the victim noticed defendant around her house on her return home from work, and shortly thereafter she was struck in the back of the head and knocked unconscious. When she regained consciousness, she was aware of a fork in her breast. After the victim told defendant that she would do what he asked, he stabbed her in the breast one more time. She was knocked unconscious again when she screamed. The victim was stabbed about six times with one of her kitchen forks. Although the victim testified that at this time her field of vision was limited because of the blow to her head and pain in her eye, she knew defendant was her attacker because she recognized his voice.

After the victim regained consciousness in her upstairs bedroom, she felt blood and became aware that her body was in the motion of sexual intercourse; she also felt a great pain in her eye. Defendant then beat her on her neck, chest, and head. She heard defendant ask if she liked it and taunt her about stopping it before he knocked her unconscious again.

When she regained consciousness, the victim felt painful anal intercourse and was aware of being hit. Defendant then forced her to "model" a white nightgown. The victim testified that during this episode of the attack, her vision cleared and she could see clearly that defendant was her attacker. Shortly after

forcing the victim to model the clothing, defendant again knocked her unconscious.

When she regained consciousness, she heard defendant smashing objects, breaking glass, and ripping things, and heard him leave the house. After the victim went downstairs to use the telephone to call her brother, defendant returned and accused her of calling the police. Whereupon defendant grabbed one of her eyes and, after asking her which was her bad eye, began pulling on it. The victim again lost consciousness as a result of the severe pain.

When the victim regained consciousness, defendant took a knife and cut her face from the side of her nose all the way through her lip. Again, the victim lost consciousness. When she regained consciousness, the victim was bleeding from her eye. After struggling to get out of the house, the victim went into the yard, where defendant caught her and covered her eye with her denim jacket. Once more, the victim lost consciousness. When she regained consciousness, the victim was inside her house attempting to climb up the stairs when defendant struck her in the head with a brass lamp. As a result, the victim lost consciousness. The victim recalled that defendant cut one of her eyes with a knife and also cut one of her fingers.

B

Dr. John Collins, a trauma surgeon at Bronson Hospital, testified that he saw the victim when she arrived at the hospital. The victim, who was caked in dried and fresh blood, had lost about half her blood volume, which indicated a life-threatening injury. She had multiple bruises to her face as well as lacerations

caused by blunt objects striking her head and face. Her left eye was gone and the cavity for her right eye was broken, with the eyeball driven into her skull. There was a large laceration on the victim's upper lip, as well as strangulation-type injuries to her neck caused by rope or twine. In addition, the doctors found abrasions on her wrists and puncture wounds on her left breast. Evidence also existed of abrasions on the victim's vagina caused by a sharp-edged object. The victim had been struck many times and suffered a "closed head injury" or cerebral edema, the effects of which are potentially permanent. The victim's injuries were life-threatening and her survival was "quite remarkable."

Don Allen Boyd, a psychologist with Hope Network, testified as an expert that the victim suffered a brain injury and head trauma and opined that the victim's memory would be more accurate after she underwent a healing process.

### C

Defendant presented two witnesses, who testified that he was at their home on the night in question. Defendant testified consistently with his two witnesses and claimed that he was not involved in the incident.

Defendant's defense notwithstanding, the jury convicted him and he was sentenced as described. This appeal followed.

### II

We first address defendant's contention that his Sixth Amendment right to confrontation was violated when the trial court allowed part of the victim's

examination to take place by way of closed-circuit television out of the physical presence of both defendant and the jury. US Const, Am VI; Const 1963, art 1, § 20. We find no error on the facts of this case.

A

At trial, the victim began testifying regarding some of the background facts of this case. Shortly after beginning her testimony, the record indicates that the victim was experiencing difficulties, and she admitted that she was having trouble testifying about the events in question. Accordingly, the prosecutor moved to allow the victim to testify by way of closed-circuit television in the judge's chambers. In order to decide the motion, the court ordered an evidentiary hearing to be held outside the presence of the jury.

At the evidentiary hearing, the victim stated that, in addition to the pressure of the jury and the media coverage, the presence of defendant frightened her. Barbara Barton, a member of the victim's rehabilitation team, testified that the thirty-six-year-old victim had dyslexia and long-standing emotional problems and that she was the emotional equivalent of a five-year-old child. Barton also testified that, in her opinion, the victim was suffering from severe stress partly as a result of defendant's presence and that, if the victim was required to testify without special provisions being afforded, the court risked the complete loss of the victim's testimony, as well as causing severe permanent damage to the victim's mental and emotional states. On the basis of this testimony, the trial court ordered the victim to testify by way of closed-circuit television.

B

The trial court relied, in part, on MCL 600.2163a; MSA 27A.2163(1) in support of its ruling. That statute, in essence, allows the special arrangements made in this case for witnesses who have a developmental disability. MCL 600.2163a(1)(b)(ii), (11); MSA 27A.2163(1)(1) (b)(ii), (11).

The primary issue with regard to the application of this statute in this case is whether the victim suffered from a developmental disability. That condition is defined as follows:

> (1) As used in this section:
> (a) "Developmental disability" means an impairment of general intellectual functioning or adaptive behavior which meets the following criteria:
> (i) It originated before the person became 18 years of age.
> (ii) It has continued since its origination or can be expected to continue indefinitely.
> (iii) It constitutes a substantial burden to the impaired person's ability to perform normally in society.
> (iv) It is attributable to mental retardation, autism, or any other condition of a person related to mental retardation because it produces a similar impairment or requires treatment and services similar to those required for a person who is mentally retarded. [MCL 600.2163a(1); MSA 27A.2163(1)(1)].

Although this issue presents a close question, we conclude that the trial court misapplied the statute because the victim does not fit within the statutory definition of developmental disability. Our focus in reaching this conclusion is on the statute's requirement that the disability be either directly attributable to, or closely associated with, mental retardation and

that the disability must have existed before the victim's eighteenth birthday.

1

Our goal in interpreting statutes is to ascertain the intent of the Legislature. *People v Stanaway*, 446 Mich 643, 658; 521 NW2d 557 (1994). One of the basic tenets of statutory construction is that words are to be given their plain and ordinary meaning. *People v Lee*, 447 Mich 552, 557-558; 526 NW2d 882 (1994). Because the statute in question does not define mental retardation, we will look to the dictionary definition of that term. *Id.* at 558.

*The Random House College Dictionary* (rev ed) (1984), p 835 defines mental retardation as a "lack of powers associated with normal intellectual development, *resulting in an inability of the individual to function adequately in everyday life.*" (Emphasis added.)

The testimony demonstrated that the victim faced some developmental challenges, i.e., dyslexia, a retarded psychological profile, and difficulties directly related to her closed-head injuries. Indeed, if the victim's mental state at trial were the only relevant consideration, we might conclude she was disabled. The record is clear, however, that many of the victim's problems stem directly from the beating she suffered at the hands of defendant, which occurred well after her eighteenth birthday.

Moreover, the evidence demonstrated that before the attack, the victim was not disabled. Although challenged, the victim seemed to function well in everyday life. Indeed, with special assistance to help her deal with her dyslexia, the victim obtained a college

degree and held down a job as a counselor. Accordingly, on the basis of this evidence, we conclude that the trial court erred in applying MCL 600.2163a; MSA 27A.2163(1) in this case.

2

Having reached this conclusion, we are mindful that the purpose of the statute, to protect developmentally disabled persons, see House Legislative Analysis, HB 4118-4121, July 8, 1987, is potentially frustrated here because the victim's disabilities are not directly related to mental retardation and did not arise until after her eighteenth birthday. Additionally, even if it were error to apply the statute, it does not necessarily follow that defendant's right to confrontation was violated. Accordingly, we must look to the Confrontation Clause of the Sixth Amendment, and the cases construing that clause, to determine whether error requiring reversal occurred below.

C

The Confrontation Clause guarantees a criminal defendant the right to be present at all stages of his trial and to a face-to-face meeting with the witnesses against him. *People v Staffney*, 187 Mich App 660, 663; 468 NW2d 238 (1991). The rights guaranteed by the Confrontation Clause, however, are not absolute. They must be " 'interpreted in the context of the necessities of trial and the adversary process.' " *Id.*, quoting *Maryland v Craig*, 497 US 836, 850; 110 S Ct 3157; 111 L Ed 2d 666 (1990).

1

In the context of a child sexual abuse case, the United States Supreme Court, in *Craig*, discussed the

requirements for allowing, in a manner consistent with the Confrontation Clause, the type of one-way, closed-circuit television examination allowed in this case.

The beginning point, from the perspective of the prosecutor, is to establish that the use of the procedure is necessary to further an important state interest. *Id.* at 851. The Court in *Craig* noted that the Maryland Legislature provided that it was important state policy to protect child abuse victims. Here, similarly, our Legislature has indicated that developmentally disabled persons are, when appropriate, entitled to preferential treatment when testifying in sexual abuse cases. While we believe that the victim in this case is not developmentally disabled as defined by the statute, we conclude that under the facts of this case, protecting this type of victim furthers the goal set forth by the Legislature in MCL 600.2163a; MSA 27A.2163(1) and does not violate defendant's constitutional rights to confront the witnesses against him.

a

First, the victim suffers from learning disabilities, as well as psychological trauma stemming from sexual abuse that began when she was two years old and continued until she was twenty. Also, the testimony demonstrated that the victim's mental capabilities were diminished as a result of the beating she endured. Further, the facts surrounding the incident in question cannot, in this case, be ignored. The manner in which the victim was abused, assaulted, raped, savaged, and molested was so horrible that even a mentally fit, otherwise healthy individual would likely be frightened by the sight and presence of her

attacker. Under facts such as this, where the witness is found to be mentally and psychologically challenged and the nature of the assault is extreme, we conclude that the physical and psychological well-being of the victim may be sufficiently important to limit defendant's right to face his accuser in person and in the same courtroom. See *Craig, supra* at 852.

b

In reaching our conclusion, we also consider the proper administration of justice, a state interest previously found to be important. See, e.g., *People v France*, 436 Mich 138, 161-163; 461 NW2d 621 (1990) (state interest in administration of justice found sufficiently important to disregard rule of automatic reversal when juror placed in seemingly compromised position).

The trial court found that if the victim were not sequestered, she likely would be unable to testify. In that event, the victim's preliminary examination testimony would have to be read to the jury, and defendant would lose his ability to recross-examine the victim. Thus, short of face-to-face confrontation, the method employed here preserved all defendant's remaining confrontation rights and, indeed, actually increased his chance at a fair trial by preserving his right to cross-examine the victim.

Additionally, although the procedure itself might be somewhat damning from the viewpoint of the jury, we conclude that it was no more so than having the witness testify for a brief period, only to halt completely, followed by the reading of her preliminary examination testimony. Under the latter circumstance, the jury could conclude that the victim was so

badly frightened that she could not testify at all, while with the method employed here, the victim was at least able to continue.

In light of both of these considerations, we conclude that the proper administration of justice supports the method employed here.

2

Although we have determined that the prosecution can demonstrate that public policy supports protecting the victim in this case, we must still determine whether the appropriate factors were considered by the trial court and whether defendant's rights were adequately protected. *Craig, supra* at 855. In order to warrant the protection afforded in this case, the trial court must hear evidence and determine whether the use of the one-way closed-circuit television procedure is necessary to protect the welfare of the witness. The court must also determine that the witness would be traumatized, not by the courtroom generally, but by the presence of the defendant and that the emotional distress suffered by the witness would be more than de minimis. *Id.*

Here, the trial court made the appropriate findings, which were supported by the record. The testimony at the evidentiary hearing demonstrated that the victim would suffer long-term mental and emotional difficulties from being forced to testify in front of defendant. The evidence also indicated that the victim's testimony could be lost entirely. Further, although the evidence demonstrated that the process in general frightened the witness, both the victim and her expert testified that the presence of defendant was an important factor. Finally, the testimony indi-

cated that the damage to the victim from testifying would be substantial.

### 3

Accordingly, we hold that, on the basis of the extreme circumstances of this case, the trial court did not err in allowing the victim to testify in the manner described. In reaching this conclusion, we stress that our holding is not to be taken by the bench and bar as a blanket approval of the application of such methods in every case. Rather, excepting those cases that fall within the ambit of MCL 600.2163a; MSA 27A.2163(1), about which we express no opinion, the remedy afforded here should be applied only in the most extreme cases.

### III

We will briefly address defendant's remaining appellate issues.

### A

First, we disagree with defendant that he is entitled to a new trial because the jury array from which his jury was selected failed to contain a representative cross section of the community. Defendant failed to appropriately raise and preserve this issue for appellate review. *People v Hubbard (After Remand)*, 217 Mich App 459, 482-483; 552 NW2d 493 (1996).

### B

Next, defendant attacks the testimony of Barbara Barton on two grounds. First, defendant claims that the trial court erred in qualifying Barton as an expert. We disagree.

1

The trial court qualified Barton as an expert in the area of social work as it relates to rehabilitation from traumatic brain injuries. Barton possesses a master's degree in social work from Michigan State University, which included classes in medical social work. Further, Barton had spent the five months before trial rehabilitating eighteen people suffering from brain injuries. In addition, she had nine years of counseling experience. On these facts, we cannot conclude that the trial court abused its discretion in qualifying Barton as an expert. See *People v Christel*, 449 Mich 578, 587; 537 NW2d 194 (1995).

2

Next, defendant argues that Barton's testimony was irrelevant and overly prejudicial. We will not review this claim, however, because defendant failed to object to any of Barton's testimony below and has failed to demonstrate that manifest injustice will result from our failure to review this claim. See *id.*; *People v Stimage*, 202 Mich App 28, 29-30; 507 NW2d 778 (1993).

C

We next address defendant's various arguments that he was denied effective assistance of counsel. Again, defendant failed to object, or preserve this issue, below. Accordingly, our review is limited to the record below. See *People v Nantelle*, 215 Mich App 77, 87; 544 NW2d 667 (1996).

On our review of the record, we conclude that many of defendant's complaints relate to trial strategy and thus do not require reversal. See *People v*

*LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995). In any event, without employing the distorting effects of hindsight, we conclude that defendant failed to demonstrate that his counsel's performance was deficient. *Id.* Accordingly, reversal is not required.

We have reviewed defendant's remaining claims and conclude that none require reversal.

Affirmed.