[Cite as *State v. Saunders*, 2024-Ohio-2224.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

v.

DAVID BRUCE SAUNDERS,

    DEFENDANT-APPELLANT.

CASE NO. 9-23-58

O P I N I O N

---

**Appeal from Marion County Common Pleas Court
General Division
Trial Court No. 2022-CR-273**

**Judgment Affirmed**

**Date of Decision:  June 10, 2024**

---

**APPEARANCES:**

    *W. Joseph Edwards* **for Appellant**

    *Raymond Grogan* **for Appellee**

**MILLER, J.**

{¶1} Defendant-Appellant, David Bruce Saunders ("Saunders"), appeals the July 7, 2023 judgment issued by the Marion County Court of Common Pleas following a jury trial. Saunders argues his right to confrontation was violated during the trial, when the victim testified by closed-circuit television from a different room than where Saunders and the jury were present. For the reasons that follow, we affirm.

## I.    FACTS AND PROCEDURAL HISTORY

### A.    Indictment and the State's Motion to Allow B.S. to Testify Via Closed-Circuit Television

{¶2} On May 11, 2022, Saunders was indicted on six counts: two counts of Rape in violation of R.C. 2907.02(A)(1)(c), first-degree felonies; two counts of Sexual Battery in violation of R.C. 2907.03(A)(1), third-degree felonies; and two counts of Sexual Battery in violation of R.C. 2907.03(A)(5), third-degree felonies. The charges arose from allegations that Saunders had engaged in sexual conduct with a person ("B.S.") who was not his spouse and who he knew—or had reasonable cause to believe—had a substantially impaired ability to resist or consent because of a mental or physical condition. Saunders had started dating B.S.'s mother around 2015, and he started living with B.S. and her mother around 2018.

{¶3} On June 5, 2023, the State filed a Motion to Allow Victim to Testify Via Closed-Circuit Television. In the motion, the State requested B.S. be allowed to testify via closed-circuit television, pursuant to R.C. 2945.482. Saunders did not file a written response to the motion, and the trial court did not rule on the motion before trial. Saunders objected to the motion at the very beginning of the trial and asked that B.S. be required to testify in open court. The trial court deferred ruling on the motion until after the State presented witnesses to provide the foundational testimony for the court to decide the necessity of B.S. testifying remotely.

**B.** **Trial Witness Testimony Prior to B.S.'s Testimony**

{¶4} The jury trial took place from June 12 to June 13, 2023. Prior to B.S.'s testimony, the State called four witnesses. The first was Officer Dana Jagger ("Officer Jagger") from the Marion Police Department. Officer Jagger had worked in law enforcement for eight years, including working as a "specialized sex assault child abuse detective" for over two years. (June 12, 2023 Tr. at 150).

{¶5} According to Officer Jagger, she received a report from a third party in January of 2022 that B.S. was being sexually abused. Officer Jagger was familiar with B.S. from a prior investigation where B.S. was the alleged victim. The officer had tried to speak with B.S. at her residence, but it was a frustrating experience because they were unable to obtain privacy sufficient for B.S. to believe she was safe in order for her to talk freely. Officer Jagger further explained "it was critically important" to get B.S. "in a place where she felt safe enough to talk." (*Id.* at 153).

{¶6} To assist with the current interview, Officer Jagger was accompanied by B.S.'s brother's girlfriend, Kayla. Officer Jagger testified that Kayla's presence greatly assisted in calming B.S., who was very scared and cried. Officer Jagger also asked Sam Grisham ("Grisham"), who had experience with individuals with developmental disabilities, to attend the interview. Officer Jagger described B.S. during this interview as "very afraid to say anything," guarded, and crying a lot. (*Id.* at 156). In addition to B.S. not knowing her own age, Officer Jagger explained that questions for B.S. had "to be broken down in a very simple fashion" and it was "very hard for [B.S.] to communicate." (*Id.* at 154-155).

{¶7} Officer Jagger said B.S. "was terrified as to the repercussions of saying anything to" Officer Jagger. (*Id.* at 155). The following exchange took place during Officer Jagger's testimony:

Q. * * * Was [B.S.] afraid she was gonna be in trouble?

A. Very much so. She kept commenting if she talked she thought she was gonna go to jail if she said anything. She thought she was gonna be grounded by her mom and [Saunders], and that she was gonna be in trouble by her mom and [Saunders], and they would keep her at the house and not let her leave.

Q. Were you able to convince her that wasn't the case?

A. It was a couple – I mean two, two and a half hours with her, and she kind of just barely started to open up. But it was – she had a very hard time processing that.

(*Id.* at 157). In fact, it had taken approximately an hour for Officer Jagger just to initially convince B.S. that it would be safe for her to go with Officer Jagger and

Kayla to the police station in order to be interviewed. Officer Jagger testified B.S. "was very much a roller coaster," would sob, and had even been "writhing around" on the kitchen floor "almost in fear of even getting in the car and coming to the station with me." (*Id.* at 156).

{¶8} Officer Jagger testified that B.S. handed over her phone, which contained photos of B.S. posing in various stages of undress. The photos were not selfies, and B.S. said Saunders had taken them. B.S. also told Officer Jagger that Saunders had "touched her with his hands on her private parts," used sex toys with her, and "touched her with his private parts on her private parts as well," indicating the areas of her vagina, buttocks, and breasts. (*Id.* at 159). According to B.S., this occurred in her bedroom. Officer Jagger also testified that B.S.'s mother had been involved in at least one of the occasions of alleged inappropriate sexual contact between B.S. and Saunders, and B.S.'s mother had been convicted of sexual battery for that involvement.

{¶9} Next, Courtney Rittenour ("Rittenour") testified. Rittenour was employed by Marion Victim's Assistance Program. She understood B.S. to be 26 years old at the time of the trial in June of 2023. Rittenour had previously worked for Marion City Schools as an aide in the disabilities program, which is where she first met B.S. in 2013 when B.S. was in high school. According to Rittenour, at the time, B.S. was disruptive in class, "was hard to stay on task," and was unable to follow school rules. (*Id.* at 170). Despite being in high school, B.S. did not know

her birth date, colors, how to count, how to tell time, how to count money, or how to read. When asked if B.S. could write, Rittenour testified she could write her first name, but did not think she was able to write her last name.

{¶10} Rittenour did not see B.S. for a few years until the Marion City Police Department called Rittenour and asked her to assist B.S. as a crime victim. According to Rittenour, at least by 2021, B.S. had fallen through the gaps in the system such that she was not receiving services with the Board of Development Disabilities, she was ineligible to receive services with Marion County Children Services because she was over the age of 22, and she was not old enough to receive services with the Adult Protective Services because she was under the age of 45. According to Rittenour, B.S. seemed to be at the same level intellectually at the time of trial as she was during high school. B.S. had been "bubbly, open, [and] always in your face" during high school; now she was "very withdrawn." (*Id.* at 172). She described B.S. as "very childlike." (*Id.* at 174). Rittenour said that B.S. had been diagnosed with mental disabilities, specifically bipolar disorder, Attention Deficit Hyperactivity Disorder (ADHD), and moderate retardation.

{¶11} Next to testify was Grisham, who had attended Officer Jagger's interview of B.S. and was an investigative agent from the County Board of Developmental Disabilities (the "Board"). The Board is a government-funded agency that provides assistance services to individuals with a developmental or intellectual disability. His job duties included conducting administrative reviews of

allegations of possible abuse, in determining eligibility for services. Grisham testified that, on the day of B.S.'s police interview, Officer Jagger had told him that B.S. was likely eligible for the Board's services. Grisham then sat in on Officer Jagger's interview of B.S., who could not read or write and kept saying Saunders "will be mad." (*Id.* at 182). Grisham discovered that B.S. had received some services when she was younger, including attending a special school. He also testified that B.S. currently received services from the Board, including that she was in a group home and had a service provider (Bridges To Independence) to assist with her daily living needs.

{¶12} The last witness to testify prior to B.S. was Traci Pigg ("Pigg"), who for the previous 20 years had been the director of Bridges To Independence. Pigg met B.S. in February of 2022. By the time of trial, Pigg had gotten to know B.S. and had "probably spen[t] more time with her than just about anybody" in the past year. (*Id.* at 195). Pigg said that, based on her experience interacting with approximately a hundred people with mental disabilities, B.S. "[a]bsolutely" was developmentally delayed. (*Id.* at 188-189). Pigg explained that B.S. now lives in a group home, where there is staffing 24 hours a day for seven days a week, because B.S. cannot care for herself and is incapable of living on her own. She further explained that individuals who live in the group home cannot be left unsupervised.

{¶13} Pigg testified that B.S. can write her first name, but can only write the first four letters of her last name. She cannot cook, has no concept of money, has

no concept of time, cannot read, and cannot drive. Workers at the group house have to give her verbal prompts to take showers and make sure she brushes her teeth, and she struggles with washing her hair, so staff helps her wash her hair. Pigg also said B.S. had been deemed incompetent through probate court, has a legal guardian, and has "[m]oderate mental retardation." (*Id.* at 195). It is Pigg's understanding that B.S. has an intelligent quotient (IQ) of 46. She described B.S. as acting very much like a kid, with a relative age between eight and twelve years old.

### C.    B.S.'s Testimony, Subsequent Witnesses, Verdict, and Sentence

{¶14} The State indicated B.S. would be the next witness, prompting the trial court to address the State's motion to allow her to testify from another room via closed-circuit television. The trial court found B.S. qualified as a developmentally-disabled person, pursuant to R.C. 5123.031, and that the requirements of R.C. 2945.482 had been met. The judge therefore granted the motion and explained how the jury and Saunders would remain in the courtroom, while the judge, court reporter, counsel for both sides, the victim's advocate, and B.S. would be the only individuals allowed in the room from which B.S. would testify. Both counsel agreed that was their understanding of how the setup for B.S.'s testimony would work. The transcript indicated B.S.'s testimony was given in the magistrate's courtroom and provided by "short circuit TV, which the jury is watching from the regular courtroom." (June 12, 2023 Tr. at 207).

{¶15} B.S. faced both direct and cross-examination. She testified Saunders had touched her breasts when she had her clothes off and had also touched her vagina, including with his penis and with sex toys. According to B.S., she did not agree to have sex with Saunders. She also testified that Saunders had taken pictures of her at her house when at least some of her clothes were off.

{¶16} After B.S. had testified, the State called a number of additional witnesses, including a forensic psychologist and B.S.'s mother. Among other things, B.S.'s mother testified that B.S. is mentally disabled and has been that way since she was born. B.S.'s mother also testified that she witnessed Saunders and B.S. having sex at least eight times, and she herself was involved one of those times.[1]

{¶17} The forensic psychologist, Dr. Jamie C. Adkins ("Dr. Adkins"), testified via Zoom videoconference by stipulation of the parties.[2] The trial court qualified Dr. Adkins as an expert in forensic psychology. Among other things, Dr. Adkins testified she had performed an evaluation of B.S. on February 10, 2022. Dr. Adkins determined that B.S. was mentally impaired, falling into the category of moderate disability. She explained that individuals in that category are those who have significant impairments in their capability to learn, function, reason, and

---

[1] B.S.'s mother testified that she was charged with, and pleaded to, sexual battery regarding that conduct. She was given the maximum sentence for the offense.

[2] At the very beginning of the trial, before any witnesses had testified, Saunders' counsel indicated he had no objection to Dr. Adkins testifying via Zoom, provided that the jurors could see Dr. Adkins and her reactions. (June 12, 2023 Tr. at 10). The irony is not lost on us that Saunders stipulated to Dr. Adkins testifying remotely but raised a Confrontation Clause challenge to the remote testimony of B.S.

communicate. She further explained that the moderate category is a category in which an individual can be institutionalized due to intellectual disability. After Dr. Adkins' testimony, the State rested its case-in-chief.

{¶18} Saunders then testified on his own behalf. Saunders admitted that he told a police officer on a body camera video (which had been played in court during earlier testimony from the officer) that he had sex with B.S. between five and eight times, B.S. was a bit slow, and he knew B.S. had a disability. Saunders testified that he did not know the scope of B.S.'s disability and that B.S. had consented to his sexual encounters with him.

{¶19} The jury found Saunders guilty of all six counts. On June 29, 2023, Saunders appeared for a sentencing hearing. In its July 7, 2023 Judgment Entry, the trial court merged various offenses, and the State elected to proceed on sentencing on the two rape counts. The trial court found Saunders to be a Tier III sexual offender and sentenced him to an aggregate prison term of 22 years minimum to 27.5 years maximum. This appeal followed.

## II. ASSIGNMENT OF ERROR

{¶20} Saunders raises a single assignment of error for our review:

**Assignment of Error**

**The trial court erred when it precluded Appellant from the magistrate hearing room thereby violating his right to confrontation under the state and federal constitutions, specifically the Sixth and Fourteenth Amendments to the United States Constitution.**

## III. DISCUSSION

**{¶21}** In his assignment of error, Saunders argues he was denied the right to confront witnesses presented against him at trial when he was excluded from the room in which B.S. was testifying.

### A. Standard of Review

**{¶22}** Whether a criminal defendant's rights under the Confrontation Clause have been violated is reviewed de novo. *State v. Dial*, 3d Dist. Allen No. 1-13-11, 2013-Ohio-3980, ¶ 11; *see also State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 172 (limitations that infringe on *core* Sixth Amendment rights are reviewed de novo). De novo review is independent, without deference to the lower court's decision. *State v. Hudson*, 3d Dist. Marion No. 9-12-38, 2013-Ohio-647, ¶ 27.

### B. Compliance with Ohio Statutory Law

**{¶23}** We first address Saunders' argument that, contrary to the requirements of R.C. 2945.482, the "State did not provide any evidence that [B.S.] was so developmentally disabled and traumatized that she could not testify in the courtroom in the presence of [Saunders] and the jury." (Appellant's Brief at 7). Thus, Saunders "contends that the evidence does not support the trial court's findings" under Ohio's statute concerning the testimony of a victim with a developmental disability.[3] *State v. Self*, 56 Ohio St.3d 73, 80, 564 N.E.2d 446

---

[3] As discussed in more detail below, this statute is separate from a similar statute addressing the requirements and procedures for obtaining the testimony of a child sex offense victim, R.C. 2945.481.

(1990). Therefore, for this particular argument, "our task as a reviewing court is to determine whether the court's findings are supported by competent, credible evidence." *Id.*

### 1. Applicable law

**{¶24}** The version of R.C. 2945.482 in effect at the time of Saunders' trial provided the following:

> (D) In any proceeding in the prosecution of any charge of a violation listed in division (B)(1) of this section * * * and in which an alleged victim of the violation or offense was a person with a developmental disability, the prosecution * * * may file a motion with the judge requesting the judge to order the testimony of the victim with a developmental disability to be taken in a room other than the room in which the proceeding is being conducted and be televised, by closed circuit equipment, into the room in which the proceeding is being conducted to be viewed by the jury, if applicable, the defendant, and any other persons who are not permitted in the room in which the testimony is to be taken but who would have been present during the testimony of the victim with a developmental disability had it been given in the room in which the proceeding is being conducted. * * * The judge may issue the order upon the motion of the prosecution filed under this section, if the judge determines that the victim with a developmental disability is unavailable to testify in the room in which the proceeding is being conducted in the physical presence of the defendant for one or more of the reasons set forth in division (F) of this section. If a judge issues an order of that nature, the judge shall exclude from the room in which the testimony is to be taken every person except a person described in division (B)(2) of this section. * * * The defendant shall be permitted to observe and hear the testimony of the victim with a developmental disability giving the testimony on a monitor, shall be provided with an electronic means of immediate communication with the defendant's attorney during the testimony, and shall be restricted to a location from which the defendant cannot be seen or heard by the victim with a developmental disability giving the testimony, except on a monitor provided for that purpose. * * *

R.C. 2945.482(D), effective April 6, 2023 to July 6, 2023.

{¶25} This portion of the statute references several other portions of the statute. First, the referenced list of violations in R.C. 2945.482(B)(1) include violations of R.C. 2907.02 (rape) and R.C. 2907.03 (sexual battery), both of which are offenses the State charged Saunders with committing. R.C. 2945.482(B)(1), effective April 6, 2023 to July 6, 2023. Second, per R.C. 2945.482(A)(1), the meaning of the term "developmental disability" has the same meaning as provided in R.C. 5123.01, which states:

> 'Developmental disability' means a severe, chronic disability that is characterized by all of the following:
>
> (1) It is attributable to a mental or physical impairment or a combination of mental and physical impairments, other than a mental or physical impairment solely caused by mental illness, as defined in [R.C. 5122.01(A)].
>
> (2) It is manifested before age twenty-two.
>
> (3) It is likely to continue indefinitely.
>
> (4) It results in one of the following:
>
> &ast; &ast; &ast;
>
> (c) In the case of a person six years of age or older, a substantial functional limitation in at least three of the following areas of major life activity, as appropriate for the person's age: self-care, receptive and expressive language, learning, mobility, self-direction, capacity for independent living, and, if the person is at least sixteen years of age, capacity for economic self-sufficiency.
>
> (5) It causes the person to need a combination and sequence of special, interdisciplinary, or other type of care, treatment, or

provision of services for an extended period of time that is individually planned and coordinated for the person.

'Developmental disability' includes intellectual disability.

R.C. 5123.01(Q).

**{¶26}** Third, division (F) of 2945.482 states the following about the judge's determination of whether the victim is unavailable to testify in the room where the defendant is present and the trial is being conducted:

(F) For purposes of divisions (D) and (E) of this section, a judge may order the testimony of a victim with a developmental disability to be taken outside the room in which the proceeding is being conducted if the judge determines that the victim with a developmental disability is unavailable to testify in the room in the physical presence of the defendant due to one or more of the following:

(1) The persistent refusal of the victim with a developmental disability to testify despite judicial requests to do so;

(2) The inability of the victim with a developmental disability to communicate about the alleged violation or offense because of extreme fear, failure of memory, or another similar reason;

(3) The substantial likelihood that the victim with a developmental disability will suffer serious emotional trauma from so testifying.

R.C. 2945.482(F), effective April 6, 2023 to July 6, 2023.

**{¶27}** Fourth, the persons described in R.C. 2945.482(B)(2) as those who do not need to be excluded from the room in which the victim's testimony will be taken are:

the victim with a developmental disability giving the testimony, the judge, one or more interpreters if needed, the attorneys for the prosecution and the defense, the victim's attorney, if applicable, the victim's representative, if applicable, any person needed to operate

the equipment to be used, one person chosen by the victim with a developmental disability giving the deposition, and any person whose presence the judge determines would contribute to the welfare and well-being of the victim with a developmental disability giving the deposition.

R.C. 2945.482(B)(2), effective April 6, 2023 to July 6, 2023. The defendant and jurors are not listed. In other words, "the judge shall exclude" the defendant and jurors "from the room in which the testimony is to be taken." R.C. 2945.482(B)(2), (D), effective April 6, 2023 to July 6, 2023.

### 2. B.S.'s qualification as a victim with a developmental disability

{¶28} Saunders alleges the State "did not provide any evidence" that B.S. was "so developmentally disabled" she could not testify in his presence. (Appellant's Brief at 7). According to Saunders, the services B.S. had been receiving had "lapsed for quite some time until recently," there never was "any test or inquiry into her mental competency," and the trial court made its determination based on testimony from unqualified witnesses. (*Id.*)

{¶29} Saunders misinterprets what is required under the Ohio statutes. As set forth above, the trial court needed to determine if B.S. qualified as "a person with a developmental disability," then, as addressed in the next subsection, whether B.S. was unavailable to testify in Saunders' physical presence for one or more of the reasons set forth in R.C. 2945.482(F). *See* R.C. 2945.482(D). The meaning of "developmental disability" is "a severe, chronic disability that is characterized by" the five requirements listed in R.C. 5123.01(Q). Considering only the testimony

adduced prior to the trial court ruling on the State's motion to allow B.S. to testify from another room, our above recitation of the trial testimony supports the trial court's finding B.S. is a person with a developmental disability. This especially includes the testimony from Rittenour, who testified about B.S.'s disability and limitations when she was approximately sixteen years old and that have continued, and from Pigg, who testified about B.S.'s disability and limitations and need for care. This testimony clearly established that B.S. had the characteristics identified in R.C. 5123.01.

>   **3.    B.S.'s qualification as being unavailable to testify in Saunders' presence for a reason set forth in R.C. 2945.482(F)**

{¶30} Saunders also alleges the State "did not provide any evidence" that B.S. was so traumatized she could not testify in his presence. (Appellant's Brief at 7). According to Saunders, "[a]side from one witness's testimony, there was never any evidence that [B.S.] was so fearful that she could never be in" his presence. (*Id.* at 8).

{¶31} Once again, Saunders misinterprets what is required under Ohio statutes. As set forth above, to allow B.S.'s testimony to be taken outside the room in which the trial was being conducted, the trial court needed to determine that B.S. was unavailable to testify in Saunders' physical presence due to one or more of three conditions listed in R.C. 2945.482(F). One possible condition was "[t]he inability of [B.S.] to communicate about the alleged violation or offense because of extreme

fear, failure of memory, or another similar reason." R.C. 2945.482(F)(2). Another possible condition was "[t]he substantial likelihood that [B.S.] will suffer serious emotional trauma from so testifying." R.C. 2945.482(F)(3). The trial court found both of these conditions were met. (*See* June 12, 2023 Tr. at 203-204).

{¶32} Our above recitation of the testimony at trial supports the trial court's finding that B.S. was unavailable to testify in Saunders' physical presence due to her inability "to communicate about the alleged violation or offense because of extreme fear, failure of memory, or another similar reason." R.C. 2945.482(F)(2). As an initial matter, by the time B.S. testified, the trial court had heard testimony about the alleged sexual conduct Saunders had engaged in with B.S. that would provide a reasonable basis for a developmentally-disabled victim to have difficulty testifying in the perpetrator's physical presence. Regarding B.S.'s inability to communicate about that conduct in Saunders' presence because of extreme fear, Officer Jagger testified it had taken about an hour simply to convince a very scared, crying B.S. to go with her and Kayla to be interviewed. This included B.S. "writhing around" on the kitchen floor and sobbing. (June 12, 2023 Tr. at 156). B.S. "was terrified as to the repercussions of saying anything to" Officer Jagger about Saunders' sexual contact with her. (*Id.* at 155). B.S. believed she would "be in trouble" with her mother and Saunders if she talked about it. (*Id.* at 157). This was further supported by the testimony of Grisham that B.S. kept saying that Saunders "will be mad." (*Id.* at 182).

-17-

**{¶33}** Saunders vaguely alludes to other possible deficiencies in the trial court's compliance with R.C. 2945.482. However, the record does not affirmatively show any failure to conform to R.C. 2945.482, so we therefore afford the trial court the presumption of regularity in the proceedings in accordance with the law. *State v. Raber*, 134 Ohio St.3d 350, 2012-Ohio-5636, ¶ 19 ("[a] presumption of regularity attaches to all judicial proceedings"); *State v. Edwards*, 157 Ohio St. 175, 183, 105 N.E.2d 259 (1952) (it is our duty to assume the court acted in accordance with the law unless the record shows the contrary).

**{¶34}** Even based only on the competent and credible testimony presented prior to B.S.'s testimony, we agree with the trial court's finding that B.S. qualified as a developmentally-disabled person, pursuant to R.C. 5123.031, and that the requirements of R.C. 2945.482 had been met.

### C. Compliance with the Right to Confrontation

**{¶35}** Saunders contends he was denied the right to confront the witnesses presented against him at trial—under both the federal and state constitutions—when he was excluded from the room where B.S. was testifying.

### 1. Applicable law under the U.S. Constitution

**{¶36}** The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." Sixth Amendment to the U.S. Constitution. "[T]his bedrock procedural guarantee applies to both federal and state

-18-

prosecutions." *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990); *see also Crawford* at 61 (the "ultimate goal" of the Confrontation Clause "is to ensure reliability of evidence").[4]

**{¶37}** The purposes of the Confrontation Clause are served through the combined elements of confrontation: oath, cross-examination, observation of demeanor by the trier of fact, and physical presence. *Craig* at 846. They "ensur[e] that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Id.* "[F]ace-to-face confrontation," specifically, "enhances the accuracy of factfinding by reducing the risk that a witness will wrongfully implicate an innocent person." *Id.* Yet the Supreme Court has never held that the Confrontation Clause requires "an actual face-to-face encounter at trial in *every* instance in which testimony is admitted against a defendant." (Emphasis sic.) *Id.* At 847.

---

[4] The Ohio Supreme Court recently recognized "tension between the United States Supreme Court's decisions in *Crawford* and *Craig*." *State v. Carter*, ___ Ohio St.3d ___, 2024-Ohio-1247, ¶ 35. Yet, state courts "are bound to follow the holdings of the high court on issues of federal constitutional law, and we leave to that court 'the prerogative of overruling its own decisions.'" *Id.*, quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989).

**{¶38}** In *Craig*, the Supreme Court identified an instance where the Confrontation Clause does not guarantee "criminal defendants the *absolute* right to a face-to-face meeting with witnesses against them at trial." (Emphasis sic.) *Id.* at 844. The case involved "a Maryland statutory procedure" that permitted, "by one-way closed circuit television, the testimony of a child witness who is alleged to be a victim of child abuse." *Id.* at 840. To invoke the procedure, the trial judge first had to determine that requiring the child victim to testify in the courtroom would result in the child suffering serious emotional distress such that the child could not reasonably communicate. *Id.* at 840-841. The Court concluded that the Confrontation Clause does not "categorically prohibit[] a child witness in a child abuse case from testifying against a defendant at trial, outside the defendant's physical presence, by one-way closed circuit television." *Id.* at 840.

**{¶39}** In its analysis, the Court in *Craig* held that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850. Thus, "[u]nder United States Supreme Court precedent, a trial judge may only dispense with the requirement of face-to-face confrontation in narrow circumstances." *State v. Carter*, ___ Ohio St.3d ___, 2024-Ohio-1247, ¶ 2.

**{¶40}** Looking first for "an important public policy," the Court concluded "that a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." *Craig*, 497 U.S. at 853. In the context of determining whether denying physical, face-to-face confrontation through the statutory procedure at issue was necessary to further that important public policy (i.e., whether the State made an adequate showing of necessity), the Court explained:

> The requisite finding of necessity must of course be a case-specific one: [First,] [t]he trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify. * * * [Second,] [t]he trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant. * * * Finally, the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis*, *i.e.*, more than 'mere nervousness or excitement or some reluctance to testify.'

*Id.* at 855-856, quoting *Wildermuth v. State*, 310 Md. 496, 524, 530 A.2d 275 (1987); *see also Self*, 56 Ohio St.3d at 78 (referencing the "three-part test" in *Craig*).

**{¶41}** Looking next to whether the testimony's reliability was otherwise assured, the Supreme Court found it "significant" that

> Maryland's procedure preserves all of the other elements of the confrontation right: The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and

defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies.

*Craig*, 497 U.S. at 851. The Court explained that "the presence of these other elements of confrontation—oath, cross-examination, and observation of the witness' demeanor—adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." *Id.* It summarized:

> [W]e conclude that where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation. Because there is no dispute that the child witnesses in this case testified under oath, were subject to full cross-examination, and were able to be observed by the judge, jury, and defendant as they testified, we conclude that, to the extent that a proper finding of necessity has been made, the admission of such testimony would be consonant with the Confrontation Clause.

*Id.* at 857; *see also Crawford*, 541 U.S. at 61 (the Confrontation Clause "commands" that "reliability be assessed in a particular manner: by testing in the crucible of cross-examination").

### 2. Applicable law under the Ohio Constitution

Turning to the Ohio Constitution, its Confrontation Clause provides:

> [T]he party accused shall be allowed * * * to meet the witnesses face to face * * *; but provision may be made by law for the taking of the deposition by the accused or by the state, to be used for or against the accused, of any witness whose attendance can not be had at the trial, always securing to the accused means and the opportunity to be

-22-

> present in person and with counsel at the taking of such deposition, and to examine the witness face to face as fully and in the same manner as if in court. * * *

Ohio Constitution, Article I, Section 10. "Though our Constitution uses the specific phrase 'face to face,' that phrase has not been judicially interpreted at its literal extreme." *Self*, 56 Ohio St.3d at 79. The Ohio Supreme Court has repeatedly said this section provides no greater right of confrontation than the Sixth Amendment. *E.g., id.*; *Carter*, ___ Ohio St.3d ___, 2024-Ohio-1247, at ¶ 33 (collecting cases and dissenting viewpoints). Furthermore, the Ohio Supreme Court's "interpretation of Section 10, Article I [of the Ohio Constitution] has paralleled the United States Supreme Court's interpretation of the Sixth Amendment." *Self*, 56 Ohio St.3d at 78. In fact, "the Ohio Constitution is also satisfied if the test enunciated in *Craig* is met." *Id.* at 80.

{¶42} In *Self*, the Ohio Supreme Court addressed an Ohio statute permitting the testimony of a child to be prerecorded as a videotaped deposition and then played at trial, if (1) the trial court had specifically found that the witness would suffer "serious emotional trauma" if required to testify in the defendant's presence and (2) the defendant was given the opportunity to develop the testimony by direct, cross-, or redirect examination. *Id.* at 76. The Court explained:

> While closed-circuit television and videotape recording did not exist when the Ohio (or federal) Constitution was written and adopted, these new technologies, when employed in accord with R.C.

2907.41[5], provide a means for the defendant to exercise the right of cross-examination and to observe the proceedings against him with the same particularity as if he and the witness were in the same room. In no sense is the defendant barred from questioning the witness or the proceeding converted to a secret or 'Star Chamber' affair.

Accordingly, we conclude that Section 10, Article I provides no greater right of confrontation than the Sixth Amendment, and hold that the use, in accord with R.C. 2907.41(A) and (B), of a child sexual abuse victim's videotaped deposition at trial in place of live testimony does not violate a defendant's right of confrontation guaranteed by Section 10, Article I of the Ohio Constitution.

*Id.* at 79.

### 3. Analysis

**{¶43}** Although R.C. 2945.482 involves testimony of persons with a developmental disability, not testimony of children, it is quite similar to the statutes at issue in both *Craig* and *Self*. *State v. Pflug*, 6th Dist. Ottawa No. OT-05-060, 2007-Ohio-2037, ¶ 30-31 ("we discern no material difference between R.C. 2945.482 and the statute approved in *Maryland v. Craig*"). The language in R.C. 2945.482 is closely aligned to the language in R.C. 2945.481, which is the recodified version of the statute at issue in *Self* regarding child sex offense victims. *Compare* R.C. 2945.482(D) *with* R.C. 2945.481(C); *compare* R.C. 2945.482(F) *with* R.C. 2945.481(E). In *Pflug*, the Sixth District examined *Craig* and *Self*, then rejected the defendant's argument that R.C. 2945.482 is unconstitutional because it

---

[5] The General Assembly subsequently recodified this statute as R.C. 2945.481 in 1997. *State v. Knauff*, 4th Dist. Adams No. 10CA900, 2011-Ohio-2725, ¶ 53, fn. 1.

allegedly deprived him of his constitutional right of confrontation. *Pflug* at ¶ 6, 18-33.

**{¶44}** "In *Craig* and *Self*, the important state interest at stake was protecting a child victim from severe emotional trauma." *Carter*, ___ Ohio St.3d ___, 2024-Ohio-1247, at ¶ 39. Here, the interest is shifted from protecting a child victim to protecting a victim with a developmental disability. *See* R.C. 2945.481 (providing "protections" to victims of certain sex offenses who are children less than 13 years of age); R.C. 2945.482 (providing "protections" to victims of certain offenses who have a developmental disability). Evidence at this trial, for example, supports a commonality between children and at least some persons with a developmental disability, including testimony that B.S. acted very much like a child and had a relative age between 8 and 12 years old. The U.S. Supreme Court has found it "undeniable" that people "who are mentally retarded have a reduced ability to cope with and function in the everyday world." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 442, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). "[T]he States' interest in dealing with and providing for them is plainly a legitimate one." *Id.*; *see also* R.C. 2913.02 (identifying a "disabled adult" as a person in a protected class for purposes of theft offenses); R.C. 2945.483 (identifying "rights to be enforced" in any proceeding in which a child or person with a developmental disability is testifying in court); R.C. 5123.62 (enumerating certain "rights of persons with developmental disabilities"); *compare Carter*, ___ Ohio St.3d ___, 2024-Ohio-

1247, at ¶ 39, 45 ("avoiding travel delays and inconvenience does not constitute a state interest anywhere near the same magnitude as that involved in *Craig* and *Self*"; concluding "the lower courts' generalized concerns about COVID-19 risks and travel delays did not constitute" a case-specific finding of necessity sufficient to abridge defendant's right to face-to-face confrontation).

{¶45} Moreover, other states have similar laws concerning the testimony of persons with a developmental disability. *E.g.*, *People v. Franklin*, 2023 IL App (1st) 200996, 229 N.E.3d 364, ¶ 75 ("the Illinois General Assembly is not the only state legislature that has made the decision to expand its law that allows for special procedures where a child victim of sex abuse testifies to adults with significant intellectual and developmental disabilities"; citing laws from Michigan, Colorado, Louisiana, and Florida). This further supports the notion that protecting a person with a developmental disability from further trauma is an important public policy. *See Craig*, 497 U.S. at 853 ("[t]hat a significant majority of States have enacted statutes to protect child witnesses from the trauma of giving testimony in child abuse cases attests to the widespread belief in the importance of such a public policy"). And, other states have allowed adult witnesses with intellectual disabilities to testify by closed-circuit television in a similar situation. *E.g., Franklin*, 2023 IL App (1st) 200996, at ¶ 75-76 (although the U.S. Supreme Court has never specifically enumerated a State interest in the psychological well-being of adult accusers of sexual abuse justifying a similar exception to the confrontation right as the one it

elaborated in *Craig*, the reasoning employed in *Craig* supports the constitutionality of such a statute); *People v. Burton*, 219 Mich.App. 278, 556 N.W.2d 201, 203-205 (1996) (affirming trial court's decision to allow developmentally-disabled victim's testimony via closed-circuit television out of the defendant's and jury's presence, under a statute whose purpose was to protect developmentally-disabled persons).

{¶46} Turning to whether denial of a physical, face-to-face confrontation at trial is "necessary to further" this important public policy, here, as in *Craig* and *Self*, the statute only allows testimony to be given through closed-circuit TV after certain case-specific findings are made. This included finding B.S. to be "a person with a developmental disability." R.C. 2945.482(D). It also included finding that B.S. was unavailable to testify in Saunders' physical presence due to her inability to communicate about the alleged offense because of extreme fear, failure of memory, or another similar reason. *Self*, 56 Ohio St.3d at 81; *see also* R.C. 2945.482(F)(2). "Here, the trial court made a case-specific finding" along these lines. *Self*, 56 Ohio St.3d at 81. As shown above, the evidence also supported finding B.S. "would be traumatized, not by the courtroom generally, but by the presence of" Saunders. *Craig*, 497 U.S. at 856. Finally, the evidence certainly showed B.S. would suffer "more than mere nervousness or excitement or some reluctance to testify." *Id.*

{¶47} Next, regarding whether the testimony's reliability was otherwise assured, although Saunders was "denied a physical confrontation, he [was] still provided a full opportunity, through counsel, to cross-examine the witness" and was

"able to observe the demeanor of the witness on the video monitor." *Self*, 56 Ohio St.3d at 78. As in *Craig*, "there is no dispute that the [developmentally-disabled] witness[] in this case testified under oath, [was] subject to full cross-examination, and [was] able to be observed by the judge, jury, and defendant as [she] testified." *Craig*, 497 U.S. at 857. Therefore, and in line with the Sixth District's decision in *Pflug*, we conclude that allowing B.S.—a person with a developmental disability who was an alleged victim of sex offenses—to testify in a room by closed circuit television in accordance with the requirements of R.C. 2945.482 did not violate Saunders' right of confrontation as guaranteed by the Sixth Amendment to the United States Constitution. *Pflug*, 2007-Ohio-2037, at ¶ 30.

{¶48} Looking to the Ohio Constitution's right to confrontation, Saunders does not claim he was entitled to greater or different rights or protections under the Ohio Constitution than the U.S. Constitution. Again in line with the Sixth District's decision in *Pflug*, we conclude that allowing B.S. to testify in a room by closed circuit television in accordance with the requirements of R.C. 2945.482 "likewise does not violate Section 10, Article I of the Ohio Constitution." *Pflug*, 2007-Ohio-2037, at ¶ 31, citing *Self*, 56 Ohio St.3d 73. "Accordingly, we hold that the presentation of [B.S.'s] testimony through the use of [closed-circuit television] was proper" under the particular circumstances in this case. *Self*, 56 Ohio St.3d at 81.

{¶49} Finally, we address Saunders' argument that "the jury cannot properly assess the demeanor of the witness via a one-way video conference testimony."

(Appellant's Brief at 9). Initially, we note Saunders does not allege the jury could not see B.S. on the video or raise any issue regarding the quality of the video broadcast of B.S.'s testimony. Thus, Saunders' argument is a general one, and one which the U.S. Supreme Court has already addressed. In *Craig*, the Court explained the Maryland statutory procedure at issue allowed the jury "to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies." *Craig*, 497 U.S. at 851. The Court found no violation of the Confrontation Clause despite the jury only being able to view the witness's demeanor by video monitor. *Id.* at 840; *see also Self*, 56 Ohio St.3d at 78-79. Like the statutes addressed in *Craig* and *Self*, R.C. 2945.482 provides that the defendant and jury are among the persons to be excluded from the room in which the testimony is to be taken. R.C. 2945.482(B)(2), (D). We reject Saunders' argument concerning the jury's ability to assess the witness's demeanor via one-way video.

## IV. CONCLUSION

{¶50} For the foregoing reasons, Saunders' assignment of error is overruled. Having found no error prejudicial to the appellant in the particulars assigned and argued, we affirm the judgment of the Marion County Court of Common Pleas.

***Judgment Affirmed.***

**WILLAMOWSKI, P.J. AND ZIMMERMAN, J., concur.**